UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

Plaintiff,

v.

AMOR M. FTOUHI,

Defendant.

Case No. l7-cr-20456

District Judge Matthew F. Leitman

Mag. Judge Stephanie Dawkins Davis

---

**UNITED STATES OF AMERICA'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE CERTAIN GOVERNMENT EXHIBITS**

---

On October 23, 2018, defendant, Amor Ftouhi, filed a motion to exclude the admission of certain government proposed exhibits.  The government intends to refer to only one of the contested exhibits—Ftouhi's will— during its opening statement.  This response addresses all of the objections raised in Ftouhi's motion in limine, but the government asks the Court to reserve ruling on all of the exhibits except for the will, so that the Court may make its ruling in the context of the other evidence and arguments presented at trial.

**Royal Bank of Canada statement for June, 2017**

The government seeks to admit a Royal Bank of Canada statement from the month of June, 2017, as a trial exhibit.  The June bank statement shows that while Ftouhi was planning his attack in Canada, he withdrew cash from his bank account.

1

Other evidence will show that he did so to purchase a gun in the United States. The bank statement is evidence of Ftouhi's preparation and planning and also shows that Ftouhi's attack involved conduct transcending national boundaries as alleged in Count Three. The defendant objects and claims that the bank statement contains evidence of other bad acts which are prohibited under Federal Rule of Evidence 404, and alternatively argues that the bank statement's probative value is substantially outweighed by a risk of unfair prejudice. The June bank statement is attached as Exhibit 1, and the English translation, excerpted below, is attached as Exhibit 2.

| Unit nº: 04541 | Account nº: 5107545 | Activity period: from 01 Jan 2017 to 30 June 2017 | | |
|---|---|---|---|---|
| **Detailed activity of your account** | | | | 746775113201707271 13501 |
| **Date** | **Description** | **Withdrawals($)** | **Deposits($)** | **Balance($)** |
| 12 June 2017 | Withdrawal RBC ATM MB47-6020 | 160.00 | | 326.56 |
| 12 June 2017 | NO DESC | 1000.00 | | -673.44 |
| 12 June 2017 | Promutuel | 81.74 | | -755.18 |
| 15 June 2017 | UM | | 1106.89 | 351.71 |
| 15 June 2017 | Withdrawal RBC ATM MH58-3997 | 1000.00 | | -648.29 |
| 16 June 2017 | Deposit RBC ATM MH58-4365 | | 1000.00 | 351.71 |
| 16 June 2017 | Withdrawal RBC ATM MC36-9397 | 400.00 | | -48.29 |
| 16 June 2017 | Withdrawal RBC ATM MC58-4368 | 140.00 | | -188.29 |
| 19 June 2017 | Withdrawal RBC ATM Plus-4283 | 276.90 | | -465.19 |
| 19 June 2017 | Interac/Plus ATM fee A-4243 | 3.00 | | -468.19 |
| 19 June 2017 | Interac/Plus ATM fee A-4283 | 3.00 | | -471.19 |
| 19 June 2017 | Withdrawal RBC ATM Plus-4243 | 276.90 | | -748.09 |
| 19 June 2017 | Overdraft protection fee | 4.00 | | -752.09 |
| 19 June 2017 | Overdraft interest | 10.80 | | -762.89 |
| 21 June 2017 | Correction RBC ATM | 1000.00 | | -1762.89 |
| 22 June 2017 | UM | | 301.23 | -1461.66 |
| 23 June 2017 | Travail Global | | 85.16 | -1376.50 |

The government anticipates that a witness will testify that the statement shows an ATM withdrawal of $1,0000 on June 15, 2017, an ATM deposit of

$1,000 on June 16, 2017,  and a June 19 overdraft fee and balance correction on June 21, 2017, which negatively adjusted the balance  $1,000.  There is no indication on either the French or English versions of the bank statement that the June 21, 2017, correction was because Ftouhi deposited an empty envelope on June 16, 2017.  Further, the government does not intended to elicit witness testimony regarding Ftouhi's empty envelope deposit.

The bank statement is not evidence of Ftouhi's character and it is not offered to show that Ftouhi later acted in accordance with a particular character trait, so its admission is not prohibited by Rule 404(a)(1).  Instead, it will be offered to show that Ftouhi's planning and premeditation for his crime extended temporally and geographically into Canada.  It will corroborate his statement to the FBI that he withdrew money for his attack while in Canada.  And it will show that he took steps to commit his crime outside the United States, which is an element of count three.

Additionally, Rule 403 does not bar its admission, because there is no risk of unfair prejudice to the defendant.

**Photo of Assault Rifle**

The government also intends to admit evidence that Ftouhi tried to purchase an assault rifle, depicted in Exhibit 3.  The government anticipates witness testimony that Ftouhi told law enforcement that on Sunday, June 18, 2017, he went

to a gun and knife show at the Gibraltar Trade Center, tried unsuccessfully to purchase a gun, and purchased a knife instead.  The government anticipates evidence at trial that FBI agents found a paper in Ftouhi's car with the location and time of the gun and knife show, that Ftouhi's Garmin GPS showed that he went to the Gibraltar gun and knife show, and that the Gibraltar Trade Center's surveillance video showed somebody who closely resembled Ftouhi at the gun and knife show. The government also anticipates that a witness will testify that during the gun and knife show, a Canadian with a beard (like Ftouhi's) and a Middle Eastern or Eastern European accent tried to purchase the rifle depicted in Exhibit 3. Evidence that Ftouhi tried to purchase an assault rifle three days prior to the attack is highly probative of Ftouhi's intent to commit murder as alleged in Count Three, and his attempt to do so.

The defense claims that the probative value of the assault rifle photo is substantially outweighed by the danger of unfair prejudice, because the weapon resembles "similar weaponry used by Islamic fighters in the Middle East."  This is a big stretch.  The photo depicts an assault rifle in its plastic case.  And, defendant tried to purchase it in Michigan, in order to commit his attack here.  Nothing about the photo connects the rifle to a conflict in the Middle East. Most importantly, the Sixth Circuit has repeatedly noted that the term "unfair prejudice" does not refer to prejudice resulting from "the legitimate probative force of the evidence; rather, it

refers to evidence which tends to suggest decision on an improper basis." *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986). Because Ftouhi's intent to murder is at issue, evidence that he tried to purchase an assault rifle is not unfairly prejudicial. Rather the evidence is highly probative for a legitimate purpose

**Post-arrest Audio Recording**

The government anticipates that Leigh Golden, a police officer, will testify that shortly after Ftouhi was arrested, he reached for her gun, said he wanted to kill her and told her his motives for wanting to kill her. Captain Golden made an audio recording of the exchange, which the government seeks to introduce as evidence of Ftouhi's motive and his intent to kill. The recording is being submitted as Exhibit 4, and has been transcribed:

> AF: Amor Ftouhi
> LG: Flint Police Captain Leigh Golden
> UI: Unintelligible
>
> UNINTELLIGIBLE ARABIC
>
> (AT 00:34)
> LG: Don't even think about it. I'll put a bullet. Don't, Don't even think about it.
> AF: Give it. Give it to me. Give it to me to kill you. Bastard. Bitch.
> LG: Don't even think about it.
> AF: You're a bitch (spitting sound, spitting sound)
> AF: Yeah. (UI) Bitch.
>
> (AT 01:50)
> AF: You happy? Happy? You kill children (UI)? In Iraq? In Syria? You're a killer.

5

LG:   I've never killed anyone.

AF:   Yeah.  Yes you.  And your nation.  You're a bastard nation.  (UI).  Kill children, kill wife.  Fuck you.  Kill.  You are killer generation.

The complete audio recording is highly probative of the fact that Ftouhi wanted to take a police officer's gun and kill the officer in retaliation against the United States.  Ftouhi-who is charged in count three with the attempted first degree murder *of a police officer*-cannot legitimately claim that his contemporaneous conduct towards police, his explanation of his animus towards American personnel and intent to kill is not probative.

Ftouhi, however, claims that this evidence is inadmissible under Rule 403.  He argues that "the act alone, of one person spitting on another, is so incendiary that it will inflame the passions of the jury to convict Mr. Ftouhi because of his bad character rather than evidence of guilt." (Def. Br. P. 14).  But it is absurd to believe that a jury would convict Ftouhi of attempted murder or the other serious charges in the indictment because he spat and cursed at a police officer.  And to redact this conduct, as Ftouhi suggests, would rob it of critical meaning and his emotion.  He did not try to kill Jeff Neville in the sterile, dispassionate way suggested by the defense and the jury should not be misled into thinking otherwise. Any prejudice from Ftouhi's cursing and spitting sounds is not unfair, because it is legitimately probative of Ftouhi's confessed intent: to kill armed American personnel. To the extent that there is any danger of unfair prejudice, it does not come close to

6

outweighing the probative value of the audio recording, and therefore Rule 403 does not bar its admission.

**Ftouhi's Letters to his Wife**

After the attack Ftouhi sent two letters to his wife in Arabic in which he made certain admissions regarding his motive for the attack. The letters were seized by Canadian law enforcement during the execution of a search warrant at the apartment of Mr. Ftouhi's family. Canadian law enforcement provided copies of the letters to the United States. English translation of the letters are attached as Exhibits 5 and 6. The government seeks to admit both letters as exhibits at trial.

After Ftouhi's arrest he was incarcerated at a Bureau of Prisons facility, FCI Milan. The content of the letters indicates that Ftouhi wrote them after his incarceration at Milan, because they describe the prison's conditions or refer to Ftouhi's court-appointed attorney. For example, in Exhibit 5, Ftouhi writes, "The room I am in is like a hotel room; it has hot water, air conditioning, a comfortable bed, a desk, a chair, and a private toilet . . ." and in Exhibit 6, Ftouhi similarly writes, "The food here is good and life is comfortable…. You can speak with the defense attorney; and if you need to tell me something, then you can talk to her."

Defendant claims that the letters are covered by the marital communications privilege, but a critical element of the privilege is that the communications must be confidential. As a general rule, letters that Ftouhi sent from a BOP facility are not

confidential.  Under BOP regulations, "outgoing mail from a pretrial inmate may not be sealed by the inmate and may be read and inspected by staff."  28 C.F.R. § 540.14(b).  There is a limited exception for "special mail," which refers to mail to or from attorneys, the courts, law enforcement, and certain government officials. See 28 C.F.R. § 540(2).

The Supreme Court has recognized a presumption that communications made between spouses are confidential. *Blau v. United States*, 340 U.S. 332, 333 (1951). "[B]ut wherever a communication, because of its nature or the circumstances under which it was made, was obviously not intended to be confidential it is not a privileged communication." *Wolfle v. United States*, 291 U.S. 7, 14 (1934).  The presence of a third party can overcome the presumption. *Pereira v. United States*, 347 U.S. 1, 6 (1954).

Here, the fact that Ftouhi's outgoing mail must be given to prison staff in an unsealed envelope and is subject to being read, overcomes the presumption that the letters were confidential. Numerous courts have found that jail calls, which are subject to being monitored and recorded are not confidential communications. See, e.g., *United States v. Medlin*, No. 3:09-00204, 2010 WL 796857, at *6 (M.D. Tenn. Mar. 1, 2010); but see *United States v. Irons*, 646 F. Supp. 2d 927, 953 (E.D. Tenn. 2009).  Letters that an inmate gives to the prison mailroom in an unsealed envelop and that are subject to being read, are likewise unprivileged.

In *United States v. Griffin*, 440 F.3d 1138 (9th Cir. 2008), the Ninth Circuit determined that jail letters, which were subject to inspection, were not confidential. In *Griffin*, the defendant sent personal letters to his wife from a California jail. Police executed a search warrant on the home of the defendant's wife and found letters from the defendant addressed to his wife as an "Attorney at Law." The letters, however, contained no attorney client communications or work product, and instead were personal communications. *Id.* at 1145.

The Ninth Circuit reasoned that because the letters were subject to being read by jail officials, they were not privileged. *Id.* at 1144. Under California jail regulation, personal mail was subject to third-party monitoring, while attorney mail was not. *Id*. at 1144-45. 45. Despite the fact that the letters were marked as being attorney mail, the Ninth Circuit held, "[u]nder these circumstances, we hold that Griffin has no right to protect from disclosure to the government as privileged marital communications those portions of letters that were improperly included in the envelopes on which he wrote "Attorney at Law."[1] *Griffin* comports with the general rule that privileges should be narrowly construed because they hinder the pursuit of truth, s*ee United States v. Nixon*, 418 U.S. 683, 710 (1974), and *Griffin's*

---

[1] Defendant's brief cites *United States v. Howton*, 260 Fed.Appx. 813 (6th Cir. 2008) (unpublished), but Howton does not appear to address the question of whether jail letters subject to third-party review, are confidential communications within the meaning of the marital communications privilege.

reasoning should apply in this case.  Because Ftouhi's mail was subject to third-party review, the letters to his wife were not confidential communications.

Even if the Court found that the letters, in general, were intended to be confidential, a portion of the letter clearly directs Mr. Ftouhi's wife to tell his children that "they must be proud of their father, who is fighting the infidel criminals.  I am not like the other Muslims, who are all talk and no action, who have held on to earthly matters, and stayed away from jiahd; thus they are shamed and humiliated."   It is clear that Ftouhi did not intend for this portion of the letter to remain confidential between him and his wife.  Accordingly, the marital communication privilege should not apply to this portion of the letter.  *Pereira,* 347 U.S. at 6 (The presumption of confidentiality "may be overcome by proof of facts showing that [it] was not intended to be private.")

**The Photos of Jeff Neville's Neck**

The government intends to admit six photographs of the injuries to Jeff Neville's neck in order to show that Ftouhi's attack caused serious bodily injury, as alleged in Count One, and to show that Ftouhi intended to kill Jeff Neville, as alleged in Count Three. The photos, attached as Exhibit 7, were taken days after Jeff Neville's emergency surgery and merely depict his external injuries.  The photos are highly probative of elements of the charged offenses.

The defendant claims that the photos "run the risk of the jury convicting Defendant not because he is guilty, but because of the jury's sympathy for Jeff Neville." (Def.'s Br. at 17-18). But the photos are not to elicit sympathy and there is no real danger of a conviction based on the jury considering the photos for that purpose. Rather, the six photos will be used to illustrate opinion testimony that Ftouhi exerted substantial force in a particularly lethal area during his attack. In other words, the pictures are probative of both his intent to kill and the "serious bodily injury" his attack caused; both of these are elements of the crimes Ftouhi is charged with. And in this circuit, far more graphic photos-autopsy and scene photos-are routinely admitted for the same purpose. *See, United States v. Brady*, 595 F.2d 359, 361-362 (6th Cir. 1979). Because the risk of unfair prejudice does not substantially outweigh the probative value of the photos, Rule 403 does not preclude their admission.

**Ftouhi's Will**

The government intends to admit Ftouhi's Will as evidence of his motive and to show that he planned his attack and engaged in conduct while in Canada, as alleged in Count Three. The government anticipates that a witness will testify that on June 22, 2017, one day after the attack, the Royal Canadian Mounted Police searched defendant's home and found his will in a safe containing other important

documents.  The will, attached as Exhibit 8 was in Arabic but Ftouhi had written

the words "mission accomplished" in French near the bottom of the will:



The English translation of the will is attached as Exhibit 9.

Defendant argues that the will is not relevant because of remoteness in time.

(Def.'s Br. at 19).  But the will itself, includes ample indicia that Ftouhi wrote it

after he had planned his attack. The will states: "Let all my family and my brothers

know that I did not go out, save for God and for the victory of His religion and His

rules, hoping that God grant me the eternal heaven and paradise."  Ftouhi went on

to tell his wife:

> You have been a good wife to me for more than 20 years.…  My
> intentions of living together and succeeding together until death
> do us apart, were truthful. However, my love for God Almighty
> and the Jihad for His sake is greater. I hope that you will forgive
> me and pray for mercy and forgiveness for me in your prayers.

(Exhibit 9)

The will also anticipates Ftouhi's imminent death: "after my death . . . I wish

to be buried . . . use the life insurance."  These passages, along with the phrase

"mission accomplished" indicate that Ftouhi wrote the will after he decided to

commit a jihadi attack. The government anticipates trial testimony that Ftouhi told law enforcement that he committed his attack because he viewed himself as a "soldier of Allah" and that he was on a "mission." That those same ideas are included in Ftouhi's will corroborates the testimony regarding Ftouhi's unrecorded confession and is highly relevant evidence of Ftouhi's motive and intent.  The will is relevant and there is no danger of unfair prejudice that substantially outweighs its highly probative value.

Respectfully submitted,

October 30, 2018

MATTHEW SCHNEIDER
United States Attorney

s/ Jules M. DePorre
JULES M. DePORRE (P73999)
Assistant U.S. Attorney
600 Church St.
Flint, MI 48502
(810) 766-5026
jules.deporre@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 30, 2018, I filed under seal the foregoing

*UNITED STATES OF AMERICA'S RESPONSE TO DEFENDANT'S MOTION IN*

*LIMINE TO EXCLUDE CERTAIN EXHIBITS* and that I mailed and emailed a

copy to Joan Morgan, attorney for Amor Ftouhi.

<u>s/Jules DePorre</u>
Assistant U.S. Attorney