# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,          CR. NO. 17-20456

          Plaintiff,                    HON. MATTHEW F. LEITMAN

          v.

AMOR FTOUHI,

          Defendant.

_____/

## <u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>

Joan Morgan
Bryan Sherer
Dana Mertz
Federal Community Defender
111 E. Court Street #L-100
Flint, Michigan 48502
(810) 232-3600

## I.   Introduction – Preliminary Statement

"If I had a stable job and family life, I wouldn't be here."[1]

From the time of his arrest, these were among Amor Ftouhi's first words, with his repeated request to be killed by law enforcement. These are not the words of a man driven by radical ideology set out to commit jihad. Instead, these are the words of a man who believed he had found a solution to end his suffering and to secure his family's future. Mr. Ftouhi believed he could not commit suicide, but that does not mean he was not suicidal.

As each layer of Mr. Ftouhi's life is peeled back, his story emerges as one that is common among men trying desperately to provide a good life for their family.  He came from a dysfunctional family, with an alcoholic father, and worked hard to achieve a different life. He prioritized his wife and children above all else, and worked hard as the sole provider in the family. The dream he and his wife shared, of immigrating to Canada for a better life, had not materialized. In the years leading up to the offense, Mr. Ftouhi grew deeper and deeper in debt, and he could see no way out of it. He felt that he had nothing left to give to his family. He felt hopeless, and believed he had discovered a solution to his problems through martyrdom.

---

[1] Statement of Amor Ftouhi, June 21, 2017, to FBI (contained in attached 302 report, Exhibit 1).

Mr. Ftouhi has always been more than what he did on June 21, 2017. He was always a devoted son, husband, and father to three beautiful, kind and loving children. He has always been a man tortured by his childhood. He has been a man who would do anything for his family- even sacrifice himself. Also, he has been a man who has lived with depression since childhood.

Mr. Ftouhi is 51 years old and facing a lifetime of imprisonment. He has no prior history of criminal activity, and he is not- and has never been- committed to any extremist ideology. The events of June 21, 2017 represent a significant deviation from the otherwise peaceful, hard-working, and loving father Mr. Ftouhi has always been. He has spent the last twenty months in solitary confinement, and he will spend the rest of his incarceration in solitary confinement. Should he be incarcerated for a term other than life, he will be deported to either Canada or Tunisia. He will have lost everything and everyone close to him in his life.

## II.   A Sentence of 25 years in Prison is Warranted in Light of the 18 U.S.C. § 3553(a) Factors

The federal sentencing statute requires that the Court tailor an individualized sentence that is "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2), and, in "determining the particular sentence to be imposed, shall consider:

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

3

(2)     the need for the sentence imposed:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In this case, a sentence of twenty-five years in prison is just and appropriate, for all of the reasons stated below.

### A.    History and Characteristics of the Defendant

#### i.    Family History

Amor Ftouhi was born in Tunisia to the union of his mother, Dalila Hannanchi, and his father, Taib Ftouhi. Dalila and Taib had six children together, with two sons: Amor and Walid, and four daughters: Sonia, Soukana, Ines and Faten. Mr. Ftouhi was the eldest child and first born son to Taib and Dalila. As such, it was his responsibility to not only take care of his own family, that is, his wife and children, but also to take care of his parents as they aged and if they became poor or too old to work. Mr. Ftouhi's mother, Dalila, also had a son, Faycal Hannanchi, from a previous marriage. Dalila's first marriage ended because her husband was physically abusive towards her. Not long after ending that marriage, Dalila married Taib, who also physically and emotionally abused her.

The first ten years of Mr. Ftouhi's life appear to be some of the best years he experienced, despite a chaotic home with an alcoholic father. The family lived in Tunis, and he attended school in the city. On the weekends, he played soccer outside with friends, and he sought refuge from the dysfunction in his home through those relationships. Mr. Ftouhi's father, Taib, was a severe alcoholic, who worked only intermittently as a truck driver, because he often lost jobs due to his poor attendance and performance related to his drinking. The irregularity of Taib's employment ultimately caused the family to have to move out of the city. The family moved from Tunis to the countryside, when Mr. Ftouhi was about ten years old. This move turned Mr. Ftouhi's life upside down. He had suddenly lost all connection with his friends, sports, and the foundation he had in the Tunis. The focus of his life became learning how to navigate his dysfunctional family and alcoholic father.



Picture of Mr. Ftouhi (standing to the right of his father)
and his five biological siblings



Picture of Mr. Ftouhi around 10 years old

The move from Tunis triggered a series of other moves that his family made in order to survive and make ends meet. Mr. Ftouhi continued to attend school in Tunis, having to take two long, public bus rides into the city each day because there were no primary schools near his home. Mr. Ftouhi described those bus trips as "long and frightening," as he was among people from all walks of life during the two-hour, one-way bus ride to and from school. School itself was also no escape from his otherwise miserable existence. Mr. Ftouhi described his early education in Tunisia with teachers who were overworked and underpaid, and often resorted to beatings for discipline.

When Mr. Ftouhi was in early adolescence, Dalila could no longer depend on Taib to provide for the family financially, so she found employment as a seamstress. As soon as he was of age, Mr. Ftouhi also worked to help provide for the family. Mr. Ftouhi's mother worked long hours, and while she was at work, Mr. Ftouhi and his siblings were either confined to their home or looked after by neighbors, some of

whom were completely unfit to care for children. Mr. Ftouhi showed resilience during his first few years living in the countryside, but as time went by, and he became a teenager, he grew more and more isolated and began developing depression.

Additionally, Mr. Ftouhi and his siblings were emotionally held hostage because of their father's alcoholism. His father controlled Dalila through physical abuse, and Dalila controlled the children by isolating them from the world, forbidding them to have any friends or activities outside of their home. Dalila took the brunt of the physical abuse, but Mr. Ftouhi suffered too when attempting to intervene and protect his mother. One of Mr. Ftouhi's first memories was around age six, when his father beat his mother so badly that a pool of blood developed underneath her as she lay on the floor unable to get up. Images like these have haunted Mr. Ftouhi all of his life.

Mr. Ftouhi never stopped trying to defend his mother from his father. Even despite his mother's cold and distant parenting style, he felt a deep connection to her and worked hard to please her. Although Mr. Ftouhi did not disclose any disparaging information about his mother, his wife, Najoua Yahyoui, reported to the undersigned that Dalila was physically abusive towards Mr. Ftouhi and his siblings, likely a reaction to the stress Taib caused her and the children. Yet, Mr. Ftouhi never stopped trying to connect with his mother and impress her. At age twenty-five, in keeping

with the principle that it was his duty as the eldest son to care for his parents, he saved up and bought the family a sheep for Eid al-Hada or the "Feast of the Sacrifice." Mr. Ftouhi's father, infuriated by this gesture, beat Dalila for accepting the gift from Mr. Ftouhi, broadcasting that he felt belittled as the man of the house. Mr. Ftouhi's father cast a large, dark shadow over the family, which followed them even after they moved out on their own.

Religion in the Ftouhi family was not often practiced. His parents were not particularly religious, and Tunisia in general, although a predominantly Muslim country, has progressive roots, where many different religions and cultures are widely practiced. It really wasn't until Mr. Ftouhi was in high school that he began attending mosque regularly, and he only did so because it was the one place his mother allowed him to go after school. Mr. Ftouhi saw this as his only opportunity to socialize, so he capitalized on it. He made friendships there, but he was not overly involved in any religious practices. As an adult, Mr. Ftouhi again looked to religion to ground him when he needed to feel a connection with others and also when he was feeling depressed about his life. Overall, Mr. Ftouhi does not have deep religious roots, and it wasn't really until shortly before the offense took place that he relied on his interpretations of the teachings of the Quran to guide his life.

Mr. Ftouhi worked hard to graduate from high school. He was smart, but he was even more determined to get out from under the grip of his dysfunctional family,

8

with the hope of starting a new life away from violence and chaos. Following high school, he attended University, where he earned a degree in sociology. He then became a sociology teacher in a secondary school, teaching children 14-18 years old. His school was located in Tabarka, Tunisia. His family arranged for him to be married to a woman named, Nada; however, Mr. Ftouhi fought the arrangement and eventually the engagement ended. Mr. Ftouhi was finally living a life free from the rules of his father, and he wanted to make his own decisions about who to bring into his life. He was afraid of history repeating itself and falling into a bad marriage only because it was the will of his parents.

### ii.    Mr. Ftouhi's Marriage to Najoua Yahyahoui

While working in the secondary school in Tabarka teaching sociology, Mr. Ftouhi met Najoua Hannanchi, who worked in a nearby school. The two met waiting for a taxi after a work day. Najoua said that Mr. Ftouhi pursued her, and she was immediately taken by him because of his kindness and sincerity. She said that Mr. Ftouhi is "a genuinely good man."  But what Najoua also saw in Mr. Ftouhi was someone who needed love and care; a man who was nearly broken by the things he had experienced as a child. Najoua believed she could be the woman to take care of him. The couple married in Tabarka in 1996.



Picture of Najoua and Amor Ftouhi at their wedding

After having broken off the arrangement with Nada, and not knowing Najoua and her family, Mr. Ftouhi's parents were reluctant to support their marriage. This caused strain to their relationship over the years and, as a result, Najoua had very little contact with Mr. Ftouhi's family, including his siblings. Mr. Ftouhi found himself split between his duty to his parents and his loyalty to his wife. As Mr. Ftouhi and Najoua began experiencing marital problems in 2016, Mr. Ftouhi's family members were quick to cast blame onto Najoua for the problems in their marriage, and they encouraged him to divorce her. However, Mr. Ftouhi remained loyal to Najoua.

Mr. Ftouhi and Najoua have three children together; a daughter, Ghada, who was born in Tunisia on April 14, 1997, a son, Ghassen, who was born in Tunisia on August 17, 2002, and a daughter, Mayar, who was born in Montreal, Canada on March 4, 2012. By all accounts, Mr. Ftouhi's children are well-adjusted, intelligent and loving people. They, like everyone who knows Mr. Ftouhi, are at a complete loss as to why their father would have suddenly decided to leave them and commit

10

an act of violence. In a letter from Ghada to Mr. Ftouhi, she wrote about how shocked she was by his sudden departure from their lives, and how she believed his behaviors must have been influenced by depression related to financial failures (See Exhibit 2, letter from Ghada to Amor Ftouhi). Ghada describes her father as the "role model" of her life, and she is still committed to making her father proud of her by working hard and being financially secure. Ghassen also wrote in a letter to his father how hard he worked (See Exhibit 3). Mayar, Mr. Ftouhi's youngest daughter (not pictured below) drew a picture of herself and her father with a rainbow and wrote that she loves him deeply (See Exhibit 4). All of the childrens' letters are translated in Exhibit 5.



Pictured (right to left): Najoua, Ghassen, Amor and Ghada Ftouhi

Mr. Ftouhi's children never knew him to be anything but a loving father, who worked hard to provide for his family and to protect them. Mr. Ftouhi prioritized his family above all else. He admitted in a letter to his daughter, Ghada, that he wished he had showed his love for her differently, and that he found it difficult to express himself, especially when he was depressed (See Exhibit 6). He then said, "Ghada

and Ghassen, you are honest, straightforward and smart persons that possess all the assets to be successful and better than your father" (See Exhibit 6). He said these things to his children because he wants them to have happiness and a better life above anything else, and he believed, because of his depression, that he would never be the one to help bring happiness to his children. The translation of this letter is in Exhibit 7.

His wife and children insisted to the Canadian police officers who interviewed them after the attack, over and over again, that he could not have committed this offense because he consistently condemned terrorist acts and he was a peaceful, quiet man. When asked by the Royal Canadian Mounted Police (RCMP) Officer to describe her father, Ghada stated he was nonviolent, generous, loyal, and that he taught her patience.[2] He had told his daughter that violence solved nothing, and she was certain her father did not commit an attack. Ghassen, too, was certain his father did not attack anyone. When asked to describe his father, he said he was courageous, kind, and religious. His wife insisted that he would not commit a terrorist offense, that her husband criticized extremists, and that her husband loved his family and worked for his children.

---

[2] The interviews of Mr. Ftouhi's family members are in French, translated for the undersigned. The discs containing the interviews and the translated notes (not verbatim translations) will be provided to the Court upon request.

### iii.    Immigration to Canada

Sixteen years into his career as a sociology teacher in Tunisia, Mr. Ftouhi found himself still only making about $700 per month, still unable to afford a home and car for his family. Nearing forty years old with two children, he began to doubt that he would ever be able to achieve his lifelong goal of living a middle-class life, owning a home, and having time to spend with his wife and children. He imagined achieving these things at least by the time he reached age fifty years old. He created this self-imposed deadline for achieving his goal initially as a motivator to keep working hard; however, the idea of achieving his goal by age fifty became, over time, an unrealistic expectation he would not be able to meet. The first step Mr. Ftouhi believed he needed to make was to leave his job as a teacher and seek more prosperous job opportunities.

It was around this same time in Mr. Ftouhi's life that he and Najoua became interested in moving to Montreal. Advertisements promoting immigration to Montreal, Quebec Canada for those seeking a better life with many job opportunities played on Tunisian television repeatedly. Montreal was soliciting immigrants from French-speaking countries to diversify the population, and the Canadian Government was offering new visas to stimulate immigration, with North Africa being one of the main regions targeted for immigration. Najoua and Mr. Ftouhi

believed Montreal would be the change they needed to make to start a new, more prosperous life for themselves and their children.

The dream of moving to Montreal became a reality for Mr. Ftouhi in 2007. He began the immigration process early that year and was on a plane to start their new life by July 2007. The plan was for Mr. Ftouhi to find employment and a place to live, and his wife and children would then join him. The journey from Tunisia to Montreal was difficult and Mr. Ftouhi had second thoughts about the move. A Tunisian couple rented him a room in their small apartment, and he worked at a grocery store, saving as much money as he could. In September of 2007, Najoua, Ghadda, and Ghassen moved in with Mr. Ftouhi in the bedroom he was renting from the Tunisian couple. They lived like this for six months before he was able to save enough money to secure a one-bedroom apartment. Eventually, the family moved into a two-bedroom apartment. At the time of his arrest, the family was living in a two-bedroom apartment that the family had rented for about six years.

Looking back, Mr. Ftouhi remembers calling Najoua after a month on his own in Montreal and telling her that he believed moving was a big mistake. He told her not to come and that he would move back to Tunisia. However, Najoua reminded him that they sold all of their belongings and he no longer had a job, so there was really nothing left for them in Tunisia. Mr. Ftouhi acquiesced and decided to make

the most out of living in Montreal. To this day, he believes that not returning to Tunisia was one of the biggest mistakes he ever made.

Mr. Ftouhi found that employment in Montreal was much harder to secure than had been advertised on television. As a first-generation immigrant, he found himself settling for menial jobs, which took an emotional toll on him and his confidence. Although he worked hard to find employment, the family needed more income and relied on the Canadian government for welfare. Mr. Ftouhi believed the government assistance was a temporary necessity, but that he would in time be able to provide enough for his family. In 2011, he was fortunate to land a cleaning job. It was a steady job, but it paid little. He worked there for five years and still struggled to make ends meet at home. He felt inadequate living off of welfare, when in Tunisia, even after earning only $700 per month, he at least was able to pay his rent and cover most living expenses.

Mr. Ftouhi's struggle to find employment was not unique to him. He was among many Muslims in Canada (Quebec especially) experiencing discrimination and Islamophobia.[3] In 2011 in Canada, 13.9% (66,000) of Muslims seeking employment were unemployed, compared to the national unemployment average of

---

[3] On January 29, 2017, a Canadian man shot and killed six worshippers, and attempted to kill 35 other worshippers, injuring 19, one paralyzed for life, at a Quebec mosque. The shooter was sentenced to 40 years in prison on February 8, 2019; in imposing sentence, the court stated that a sentence which offered no hope of release was "grossly disproportionate and totally incompatible with human dignity". See   https://muslimlink.ca/news/two-years-and-a-verdict-later-what-next-for-muslims-in-canada-after-the-quebec-mosque-shooting.

7.8%.[4] In response to the alarming attack on the mosque in Quebec on January 29, 2017, the increasingly high unemployment rate among Muslims, and overall to the various changes resulting from the growing population of Muslims in Canada, the Canadian Dawn Foundation was commissioned to study the issues Muslims were facing.[5] Regarding unemployment among Muslims, the study confirmed that the major factor impacting Muslim immigrants from gaining meaningful, stable, and fruitful employment was based on their religion and ethnicity, even when the individual was otherwise skilled and qualified for the job.[6] Mr. Ftouhi experienced this first hand, as he was hired by employers who believed he was Hispanic, only to cut his hours after finding out his was Muslim. In addition, Islamophobia has led to a growing number of hate crimes targeting Muslims in Canada, including violent hate crimes.[7] Mr. Ftouhi and his family settled in a neighborhood with other Tunisian immigrants. The small three-block neighborhood had a Tunisian café and bakery. Days after he purchased his first car, the used minivan found following the offense, all four of his tires were slashed, along with others on the street where he

---

[4] http://iqra.ca/2015/canadian-muslims-face-high-unemployment/.

[5] Id.

[6] Id.

[7] Ferreras, J. (2018, November 30). In Canada, Jews face more hate crimes, while Muslims face more violent ones: StatCan. *Retrieved from*: https://globalnews.ca/news/4714114/canada-jews-muslims-hate-crime/

was parked. Mr. Ftouhi believed he and his neighbors had been targeted because they were Muslim.

Despite Mr. Ftouhi's efforts at securing proper training, language and professional skills, he continuously struggled to secure a stable job that paid above minimum wage. His first attempt to climb out of his minimum wage job was to attend a training program to become a security guard. Following the training program, he was placed in an unarmed security position at the Montreal airport. However, as the weeks passed, Mr. Ftouhi found himself being offered fewer and fewer hours on the schedule at the airport. After six months, he was no longer being offered any hours at work, so he was forced to find a new job.

He tried other security companies, but he was turned down each time. He then attended a training to become an insurance claims adjuster. After a year-long training, he obtained his insurance certificate. He was proud of his accomplishment and hopeful for his future. He sent a photograph of himself in a graduation gown to his mother in Tunisia, who had it enlarged and hung it in her living room for everyone to see.



Picture of Mr. Ftouhi with his Insurance Certificate

Unfortunately, it was more of the same for Mr. Ftouhi after graduation. He saw his fellow classmates taking positions at insurance companies, while he was turned down time and time again for jobs.

But, Mr. Ftouhi did not give up on his dream and his desire to provide for his family. He obtained his commercial driver's license and looked for work as a truck driver. Shortly before his arrest, he had been hired by Urgence Marine, where he drove a truck that recycled waste from boats anchored in the port of Montreal. Each week, he waited by the phone to learn whether he would be scheduled to work. His hours on the schedule dwindled, and he once again could not make ends meet at home. The pressure was greater, given that the government no longer was supporting the family through welfare. Expenses piled up, and Mr. Ftouhi paid for everything on his credit cards. Mr. Ftouhi felt as if Urgence Marine was another company discriminating against him because he was Muslim. He grew angry, anxious about his future, and desperate to figure out a way to take care of his family.

## B. The Sentencing Guidelines

The guidelines on all counts call for a sentence of life imprisonment. Post-*Booker*, the Supreme Court has made clear that sentencing courts must consider the individual circumstances of a defendant's background; the Court is not mandated to follow the guidelines or the policy decisions of the Sentencing Commission, *Pepper v United States*, 562 US 476, 131 SCt 1229 (2011):

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. *Pepper*, 562 US at 487, 131 SCt at 1239-40, quoting *Koon v United States*, 518 US 81, 113 (1996).

The terrorism enhancement is the most severe of all sentencing enhancements. It increases both the offense level and criminal history category for defendants convicted of a felony "that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4. Absent the terrorism enhancements under USSG 3A1.2 and 3A1.4, the advisory guidelines range for these offenses would be 210-262 months (Base Offense Level 37, CHC I). With it, the advisory guidelines range is  Life ( Offense Level 55,[8] CHC VI).

---

[8] Since offense level 43 is the highest offense level under the guidelines, that became the adjusted offense level according to Probation on Page 8, paragraph 35 of the Presentence Report.

The Sentencing Commission did not develop the enhancement based on empirical evidence, and the use of Criminal History Category VI is entirely unwarranted for a person with no prior criminal record.

A similarly inequitable outcome would result if the terrorism enhancement were applied to increase Mr. Ftouhi's criminal history category. Mr. Ftouhi has no prior arrests or convictions and has never served time in prison before. He should be in Criminal History Category I. But the terrorism enhancement places all terrorism offenders in Criminal History Category VI without regard to individual background. Criminal History Category VI is typically reserved for career offenders. Even armed-career criminals and repeat and dangerous sex offenders are not automatically placed in Criminal History Category VI. See U.S.S.G. § 4B1.4 (armed career criminals are category IV at minimum); § 4B1.5 (repeat and dangerous sex offenders are category V at minimum).

The placement of all terrorism defendants into Category VI undermines a basic principle of sentencing law: that punishment should be proportional to a defendant's personal history and characteristics. It is also "fundamentally at odds with the design of the Guidelines" because it "impute[s] to a defendant who has had no criminal history a fictional history of the highest level of seriousness. It's one thing to adjust the offense level upward to signify the seriousness of the offense. It is entirely another to say that a defendant has a history of criminal activity that he

does not, in fact, have.[9] See *United States v Jumaev*, No. 12-cr-00033-JLK (D Colo R 1920, filed 7/18/2018).

Guideline 4A1.3 permits horizontal downward departures where "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b). Nothing in the text of Guideline § 4A1.3 restricts its application in cases where § 3A1.4 is applied; the Court has discretion to grant a horizontal departure following application of the terrorism enhancement. *See United States v. Meskini,* 319 F.3d 88, 92 (2d Cir. 2003) ("[a] judge determining that § 3A1.4(b) over-represents 'the seriousness of defendant's past criminal conduct or the likelihood that defendant will commit other crimes' always has the discretion under § 4A1.3 to depart downward in sentencing."). *See also United States v. Preacely,* 628 F.3d 72, 81 (2d Cir. 2010).

At least two courts have granted such departures. The defendant in *United States v. Aref*, 04 Cr 402 (Doc. 450) (N.D.N.Y.), was convicted of ten counts, including conspiracy to provide material support to a terrorist organization. The convictions arose from a protracted conspiracy to fund terrorist organizations overseas and to import surface to air missiles into the United States. *Id.* at 3. Despite

---

[9]Brown, G., *Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts*, 23 Cornell J.L. & Pub. Pol'y, 517, 539 (2014) (citing Transcript of Disposition at 69, *United States v. Mehanna*, No. 09-10017-GAO (D. Mass. 2012)).

the elaborate nature of the conspiracy, extensive planning, and domestic aims, the court determined "that a criminal history category of VI does substantially over-represent the seriousness of [the defendant's] criminal history" and that criminal history category I was more appropriate: "Based upon [the defendant's] lack of prior criminal history, and his personal characteristics, the Court finds his circumstances to be extraordinary and that a downward departure is warranted to a criminal history category of I." *Id.* at 5-6.

The defendant in *United States v. Benkahla,* 501 F.Supp.2d 748 (E.D. Va. 2007), was convicted of two counts of false statements to a grand jury, obstruction of justice, and making false statements to an FBI agent after repeatedly denying having participated in terrorism training that included handling and discharging firearms or explosive devices. *Id.* at 750-51. The sentencing court addressed the disproportionate impact of the terrorism enhancement on the defendant's criminal history category: "For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside of the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history." *Id.* at 759. The court further found that criminal history category VI over-represented the likelihood that Benkahla would commit other crimes and stated he was "the quintessential candidate for a downward departure under 4A1.3." *Id.* Accordingly, it reduced Benkahla's criminal history category to I.

Like Aref and Benkahla, Mr. Ftouhi is a strong candidate for departure under Guideline § 4A1.3. Since he has no prior criminal record, Criminal History Category VI necessarily over-represents his criminal history. It also substantially over-represents his chance of recidivism. Individuals with no criminal record have the lowest rate of recidivism,[10] and there is no data to suggest that defendants with terrorism convictions recidivate at higher rates than other offenders.[11]

### C. Nature and Circumstances of the Offense- How Depression and Suicidal Ideation Led to the Commission of this Offense

Mr. Ftouhi's sister, Sonia, and his wife, Najoua, confirmed that he both witnessed and experienced physical and emotional violence throughout his childhood. Both parents were abusive; his father was verbally and physically abusive during drunken rages, and his mother beat all of her children to ensure compliance. Understanding and learning about Mr. Ftouhi's early childhood is the most necessary piece to understanding him as an adult, because of the causal relationship between childhood trauma and the development of mental disorders.[12] Childhood maltreatment, just one type of Adverse Childhood Experiences (ACEs), has been

---

[10] See "*Recidivism and the "First Offender*", US Sentencing Commission at 26 (May 2004) (93.2% of first time offenders did not recidivate).

[11] McLoughlin, J., (2010). *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51, 114-15.

[12] http://www.fd.org/docs/select-topics/sentencing-resources/using-social-science-at-sentencing-(may-2014).pdf?ssfvrsn=4.

linked to a variety of changes in brain structure and function and stress-responsive neurobiological systems.[13] ACE is a term that refers to childhood abuse, neglect, and exposure to other traumatic stressors.[14] Studies show that there is a causation between childhood abuse, domestic violence and serious household dysfunction and the development of serious health and social problems in adulthood.[15]  In addition, the cumulative exposure of the ACEs on the developing brain of a child results in impairment in multiple brain structures and functions in the brain.[16] This is why teens develop depression and anxiety, and turn to unhealthy coping mechanisms like substance abuse and other self-destructive behaviors, and it also why many adults suffer from mood disorders.[17]

The trauma Mr. Ftouhi experienced as a child, when living in a hostile environment and watching his mother violently abused, caused him to experience severe anxiety as a youth. As a coping mechanism for his anxiety, he began pulling out his hair, a condition called, Trichotillomania. Trichotillomania is an impulse control disorder seen in children undergoing the internalization of extreme stress,

---

[13] Chapman, D.P., et al. (2004). Adverse childhood experiences and the risk of depressive disorders in adulthood. *The Journal of Affective Disorders, Vol. 82*, 217-225.

[14] http://www.cdc.gov/ace/index.htm.

[15]  http://www.ojjdp.gov/pubs/240555.pdf. See Santosky v Kramer, 455 US 745, 789 (1982) (Rehnquist, J. joined by Burger, CJ, White and O'Connor, J., dissenting) ("It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens").

[16] http://www.cdc.gov/ace/index.htm.

[17] Van der Kolk, B.A., Fisler, R.E. Childhood abuse and neglect and loss of self-regulation. *Bulletin of the Menninger Clinic*; *Spring 94*, Vol. 58 Issue 2.

anxiety and depression.[18] In addition, dysfunction in families is a common issue among children and adolescents with Trichotillomania.[19] Although Mr. Ftouhi stopped pulling out his hair, his anxiety and depression persisted throughout his teenage years and into adulthood. Despite gaining a wife, three children and independence from his parents, he remained tethered to the trauma of his childhood, most noticeably through his chronic depression.

Somehow, Mr. Ftouhi managed to hide his feelings and give others the impression that he was successful and happy. And, for some years, he was truly happy with his life. His marriage and the birth of his children were the best and happiest days of his life. To his mother and sisters, Mr. Ftouhi was the "example of a successful person in life."[20] When Mr. Ftouhi lived in Canada, he sent his mother nearly $400 per month, so she assumed he was doing well for himself. Even Sonia, who is a journalist in Tunisia and makes a good living, thought her brother had a successful career in Montreal, as he sent her money as well from time to time. It was important for Mr. Ftouhi to give money to his family and for them to believe he was doing well. However, there was one person in Mr. Ftouhi's life that knew the truth about him. Najoua's brother, Kamel Yahyaoui, Mr. Ftouhi's best friend for over

---

[18] Harrison, J. P., & Franklin, M. E. (2012). Pediatric trichotillomania. *Current psychiatry reports, 14(3)*, 188-96.

[19] Id.

[20] Quote from defense interview with Mr. Ftouhi's sister, Sonia Ftouhi, dated September 12, 2017.

twenty years, knew that he was hiding his financial struggles from his whole family. In an interview with a member of Mr. Ftouhi's defense team, Kamel said, "Mr. Ftouhi could not be his own person inside his family," and he talked about how Mr. Ftouhi believed he would lose all support from his wife, and family in Tunisia if he wasn't able to provide financially and send money home to his parents and siblings.[21]

Mr. Ftouhi never spoke to anyone about how much pain he experienced. He never spoke to his wife about their dire finances, and he never let on to his children that they, at any time, could be without a roof over their head. Instead, he opened new credit cards and piled on expenses, and even used cash advances to send money home to his family. He had accrued about $30,000 of debt prior to the offense. It is commonly understood that financial stress is like a low-hanging black cloud that never disappears. Men, especially, feel pressure to be providers for their families, and in Muslim families like Mr. Ftouhi's, where the man is expected to be the sole provider, the pressure is often multiplied. Serious financial problems are a major threat to a person's self-worth, and a large contributor to major depression and even suicide in men.[22]

---

[21] Defense interview with Kamel Yahyaoui, dated October 24, 2017.
[22] Duberstein, P., Conwell, Y., Conner, K., Eberly, S., & Caine, E. (2004). "Suicide at 50 years of age and older: Perceived physical illness, family discord and financial strain". *Psychological Medicine, 34(1)*, 137-146.

Mr. Ftouhi hid his debt from Najoua and continued on as if things were normal. In the year leading up to the offense, the debt, his lack of ability to see his future, and his utter despair became so overwhelming that he started to isolate himself from his family. Najoua grew concerned about his emotional withdrawal, but she thought it was because he was cheating on her with another woman. She did not see his deteriorating mental state, and instead attributed his lack of motivation and interest as a slight on her. Mr. Ftouhi, heartbroken over his wife's accusation of infidelity, moved out of their home for about six months in late 2016 and into early 2017, and he contemplated divorce. He rented a room he paid for with his credit cards, and continued to take care of his family's expenses on the credit cards as well. It was during the six-month separation that Mr. Ftouhi began to slip away- closer to his religion and further from his wife and children. Also, it was then that Mr. Ftouhi began thinking about dying, which is not surprising given how depressed and hopeless he felt.

Although Mr. Ftouhi was not raised in a particularly religious household, and he was not a particularly devout Muslim for most of his life, he admittedly looked to the Quran for guidance through his depression and his separation from his wife. It was at this point in his life when he began to see the world through depression-laden eyes, and his views on politics and the political war in the Middle East changed and became a focus for him. He watched Al Jazeera television, which showed a

constant stream of tragedy involving women and children suffering and dying. He blamed the United States for standing by and/or taking part in atrocities in the Middle East. He believed, rightfully so, that "his people," innocent women and children, were being killed either directly or indirectly by the United States. The chemical weapon attack on April 4, 2017 by the Syrian government that left at least 74 people dead, most of whom were women and children, and over 557 injured, was declared by President Bashar al-Assad as a fabricated event.[23]

Mr. Ftouhi began to focus on tragedies to avoid facing the turmoil inside of him. He followed prominent preachers, such as sheikhs Abdelhamid Kischk and Wajdi Ghenim, who are not jihadi but support political activities in defense of Muslims worldwide. He listened strictly to sheikhs Kischk and Ghenim primarily, but he had no idea who the radical preacher, Anwar al-Awlaki was. He also never conducted internet searches about radical Islamic groups, searched or posted on social media about radical ideology, and he had no ties whatsoever to any radical groups. Even so, he did believe that his preachers were telling him he must act and fight his enemies, and that it was not enough to simply live a good, law-abiding life. He heard these messages when he was isolated, alone and depressed. He also believed that if he ended his life by becoming a martyr, he could give his family the

---

[23] Syria chemical 'attack': what we know. April 26, 2017. BBC News. *Retrieved from:* https://www.bbc.com/news/world-middle-east-39500947

28

ultimate gift; a place in Paradise. He had given up on himself and believed he'd never be able to offer his family anything in this life.

As his "Last Will and Testament" left for Najoua implies, Mr. Ftouhi believed he had found a "solution" to his financial and emotional predicament: become a martyr for Allah and earn a place in Paradise for him and his family as his reward. Following his death, Najoua would be able to collect on an insurance policy for Mr. Ftouhi and clear all of their financial debt. Mr. Ftouhi truly believed this was the creative answer to all of his problems both in the present and in the afterlife.

As desperate and hopeless Mr. Ftouhi was, he never believed traditional suicide was ever an option for him. To him, as a Muslim, suicide is considered to be a major sin. Islam teaches that this life is simply a test to determine our place in the eternal life after death.[24] Mr. Ftouhi believed he could not commit suicide, but he very much wanted to end his life on earth and end his suffering. He was suicidal.

Suicide is defined as a deliberate attempt to kill oneself, where the outcome is fatal.[25] Suicide is a complex behavior with a wide range of underlying causes.[26] It is typically an escape from aversive self-awareness, or a means to avoid facing ones

---

[24] Lankford, A., "What You Don't Understand about Suicide Attacks", Scientific American, July 27, 2015, found at https://www.scientificamerican.com/article/what-you-don-t-understand-about-suicide-attacks/?print=true.

[25] Chehil, S., Kutcher, S. (2012). Suicide Risk Management- A Manual for Health Professionals. Hoboken, New Jersey: Wiley-Blackwell.

[26] Id.

perceived failure to meet expectations and standards.[27] Mr. Ftouhi blamed himself for not being able to meet the expectations he set for himself to own a home, and have a stable, fulfilling job. He internalized each failure, which exacerbated his low self-esteem. He saw himself as worthless and a failure, which contributed both to his deep depression and anger at himself and the world. It became so painful for him to think about his future and his failings that he began looking for a way to escape it. He began to withdraw from his family and made plans to take the ultimate step to escape from himself and the world. However, as previously stated, Mr. Ftouhi did not believe he was permitted to take his own life.

Mr. Ftouhi believed he needed to be killed as a "soldier of Allah" by a uniformed enemy of Muslims in order to solve his problems of debt, to enter Paradise, and to end his life. He did not believe Allah would accept that an armed Canadian Officer was an enemy of Muslims, but he believed an armed United States government official would be acceptable to Allah, given his perceived view of U.S. involvement in the Middle East. This was why Mr. Ftouhi decided to go the United States and attempt to kill a uniformed agent of the State (in a sense a United States "soldier") so he would be killed by other "soldiers" in the attempt. In a sense, this is "suicide by cop",[28] which he believed would wipe out his debt and give the key to

---

[27] Baumeister, R. F. (1990). Suicide as escape from self. *Psychological Review, 97*(1), 90-113.

[28] Suicide by cop is defined as an individual who made gestures and/or verbalized their desire to be killed by law enforcement when confronted by officers. Lord, V. "Law Enforcement-Assisted

Paradise for him and his family. Mr. Ftouhi threatened them with death and expected to be killed in return.

## D. Nature and Circumstances of the Offense – The Offense Conduct

The conduct that occurred in this case can only be characterized as deeply disturbing and egregious, and he could have caused even more damage, had he not been stopped. As we look at Mr. Ftouhi's life and mental state at the time of the offense, we do have a better understanding of what motivated him. Mr. Ftouhi was motivated ultimately by his desire to take his own life in order to provide for his family in the afterlife. His plan was never to become an indiscriminate killer, attempting to create a mass casualty situation, nor was he trying to be a member of any radical Islamic group.[29]

Mr. Ftouhi's desire to die as a martyr is supported by terrorism expert Arie W. Kruglanski of the University of Maryland. He explains that individuals may engage in suicidal behavior because "personal significance is a motivation that has been recognized by psychological theorists as a major driving force of human behavior. Some individuals feel that through suicide, their lives will achieve

---

Suicide", Criminal Justice and Behavior, Vol. 27, No. 3 (June 2000) 401-419; see also Miller, L. "Suicide By Cop: Causes, Reactions, and Practical Intervention Strategies", Intl. Journal of Emergency Mental Health, Vol. 8, No. 3, pp. 165-174 (2006) and Homant, R. and Kennedy, D. "Suicide by police: a proposed typology of law enforcement officer-assisted suicide", Policing: An Intl. Journal of Police Strategies & Management. Vol. 23 No. 3(2000) pp. 339-355.

[29] His post arrest statement articulated his desire not to harm innocent women and children.

tremendous significance; they will become heroes, martyrs. In many cases, their decision is a response to a great loss of significance, which can occur through humiliation, discrimination or personal problems that have nothing to do with the conflict in which their group is engaged." See Pacific Standard Magazine (online edition), "The Mind of a Terrorist", by Tom Jacobs, February 24, 2010. [30]

Mr. Ftouhi most certainly believed he would have been killed on June 21, 2017, and when he wasn't killed, he was very upset. His statements following his arrest revealed his state of mind. He did not care what happened to him, he used words and behaviors to provoke law enforcement officers, and hoped someone would kill him. He told law enforcement that he did not want a lawyer to represent him, he told the officers not to feed him, and he said that he did not care what happened to him.

Mr. Ftouhi chose to believe that that Allah was commanding him and his fellow Muslims to act and fight his enemies. He latched onto this idea because it helped him justify his desire to end his life. If he is called a "terrorist" in the newspapers, in prison, or in the courtroom, it gives him the hope that he is truly a martyr, and thus not a complete failure. This is also precisely why he has not denounced his behaviors. Mr. Ftouhi is in a psychological bind that does not allow

---

[30] https://psmag.com/social-justice/the-mind-of-a-terrorist-8638.

him to ask for forgiveness or admit that he failed at martyrdom. He believes if he denounced his behaviors, he and his family would be doomed to a life in hell.

## E. Seriousness of the Offense, Promoting Respect for the Law, and Just Punishment for the Offense

Defense counsel's request for a sentence of twenty-five years of imprisonment accounts for both the amount of time Mr. Ftouhi will be incapacitated[31] and removed from society, but also how Mr. Ftouhi will spend his twenty-five years in prison.[32] Since his arrest, Mr. Ftouhi has been held in the Special Housing Unit (SHU) at the Federal Correctional Institute (FCI) in Milan, MI under Special Administrative Measures ("SAMs"). Anytime he moves outside of his cell, he is put in full restraints, including for meetings with defense counsel. He is locked in his cell 23 or 24 hours

---

[31] According the IRS table at 26 CFR 1.72-9, a 51 year old's life expectancy is 24.7 years, found at https://1.next.westlaw.com/Document/NCEAAF9108C1A11D98CF4E0B65F42E6DA/View/FullText.html?transitionType=UniqueDocItem&contextData=(sc.Default)&userEnteredCitation=26+cfr+1.72-9. Social Security life expectancy puts the same 51 year old male at a life expectancy of 28.75 years, see https://www.ssa.gov/oact/STATS/table4c6.html#%20%20ss.

[32] Both the length and the severity of incarceration can be taken into account in determining a sentence, *United States v Spano*, 476 F3d 476, 479 (7th Cir 2007); *United States v Noriega,* 40 FSupp2d 1378 (SD Fla 1999) ("There is little question that [segregated confinement] is a more difficult type of confinement than in general population. For some, the consequences of such deprivation can be serious."); *McClary v Kelly*, 4 FSupp 2d 195, 207 (WDNY 1998) ("a conclusion however, that prolonged isolation increases the risk of developing mental illness does not strike this court as rocket science. Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances [citing cases]."

each day. He eats in his cell. He is permitted showers three times a week, again in full restraints.

Conditions at SHUs are so harsh that many courts have found pretrial incarceration in a SHU to form the basis for a variance or departure from the guidelines. See *United States v Stewart*, 590 F3d 93, 143 (2d Cir 2009); *United States v Pressley*, 345 F3d 1205 (11th Cir 2003); *United States v Carty*, 264 F3d 191 (2d Cir 2001); *United States v Ortiz*, 2007 WL 4208842 (DNJ 2007); *United States v Mateo*, 299 FSupp2d 201 (SDNY 2001); *United States v Rodriguez*, 214 FSupp 2d 1239 (MD Ala 2002); and *United States v Bakeas*, 987 FSupp 44 (D Mass 1997). And lengthy confinements in SHUs have led to Section 1983 lawsuits, on the grounds that they impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life", *Colon v Howard*, 215 F3d 227, 228-29 (2d Cir 2000)[33], citing *Sandin v Conner*, 515 US 472, 484 (1995); *Mitchell v Horn*, 318 F3d 523, 532 (3d Cir 2001).

But, Mr. Ftouhi's future incarceration will be much harsher than what he has already experienced in the SHU. People convicted of terrorism related offenses are placed in Florence, Colorado in the Administrative Maximum Security Facility, also

---

[33] Judge Jon O. Newman of the Second Circuit suggested in *Colon*, 215 F3d at 232, that the Second Circuit establish a bright line rule that confinement in normal SHU conditions that exceeds more than 180 days meets the *Sandin* standard.

known as "Florence ADX". Based on the nature of his charges and the length of time he will spend in prison, he will serve his sentence in this "supermax" prison.

Florence ADX houses up to five-hundred prisoners in eight units. Each inmate is placed in a single cell that is 12 feet by 7 feet with thick concrete walls and a set of double sliding metal doors. The doors have solid exteriors to prevent inmates from seeing one another. The cells have a single window, which sits about three feet high and is about four inches wide. The only thing visible from the window is a small part of the sky. As captured in the photo below, each cell has a sink, toilet, shower, and a concrete slab for a bed.  However, this photo captures a cell in the main housing unit in Florence, and therefore has a larger window. Those prisoners labelled terrorists, like Mr. Ftouhi, will be housed in a different unit, where the cell is similar, only without such a large window.



Photo of cell at ADX Florence[34]

All meals served to the inmates come through the slots in the interior door of the cell. In addition, all human interaction the inmates have only takes place through the slot in the door. Inmates in ADX routinely go days with only a few words spoken to them.

Those who are in general population (not in the Control Unit) of ADX are allowed exercise outside of their individual cells. These inmates are either taken alone to a different cell that has a single chin-up bar or taken outside to the yard, where they are placed inside a cage to walk around. Recreation is never guaranteed and often cancelled.

Serving twenty-five years in Florence ADX in solitary confinement is a more proportionate response than life imprisonment to Amor Ftouhi's actions on June 21, 2017. It is important to appreciate that twenty-five years in solitary confinement is, in essence, a social death, and has the potential of leading to Mr. Ftouhi's death. Living under the conditions of solitary confinement for twenty-five years will cause atrophy of Mr. Ftouhi's brain, due to a deprivation of stimulation and human contact, which, in turn, will cause severe problems with his mental and physical health. It is

---

[34] "Inside America's Toughest Federal Prison", *New York Times Magazine,* March 26, 2015, at https://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-prison.html.

undisputed that solitary confinement takes a tremendous toll on a person's mental health. A 2016 Presidential report[35] stated:

> Research suggests that solitary confinement can lead to lasting psychological consequences and has been linked to a range of mental health conditions, including depression, anxiety, and withdrawal, along with the potential for violent behavior (Haney 2003). While estimates of the prevalence of solitary confinement vary, recent research finds that its use is widespread; in 2012, almost 20 percent of prison inmates and 18 percent of jail inmates reported spending time in restricted housing in the past 12 months or since coming to their current facility. Certain categories of prison inmates were especially likely to have reported spending time in restrictive housing during the past 12 months, including prisoners with less than a high school education and prisoners who had a history of mental health problems (Figure 38; Beck 2015).

The Bureau of Prisons is seriously understaffed, especially in the mental health department. A 2017 report from the Office of the Inspector General ("OIG") for the Department of Justice, stated that Bureau of Prisons ("BOP") data showed that three percent of its inmates received regular mental health treatment while a 2016 BOP study showed that 19 percent of its inmates had a history of mental illness and a 2006 Bureau of Justice Statistics report concluded that 45 percent of federal inmates had a recent history of mental illness.[36] The OIG study found that since 2014, the BOP adopted a new mental health policy which resulted in a thirty percent decrease in the number of inmates who receive mental health treatment, *id* at iii. As

---

[35] "Economic Perspectives on Incarceration and the Criminal Justice System", April 2016, Page 64, at https://obamawhitehouse.archives.gov/sites/default/files/page/files/20160423_cea_incarceration_criminal_justice.pdf.

[36] "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness", found at https://oig.justice.gov/reports/2017/e1705.pdf.

of October 2015, the BOP had filled 57 percent of its authorized full time psychiatrist positions nationwide, with significant staffing issues for psychologist positions. *Id*.

The lack of adequate mental health treatment at ADX has been the subject of much litigation, including a class action, *Cunningham v Federal Bureau of Prisons*, No. 12-01570 (D Colo). That case was settled in part (see R 382) but settlement negotiations have continued, as recently as this month. Another terrorism defendant from the Eastern District of Michigan, Umar Farouk Abdulmutallab, is in litigation over the conditions of his confinement at ADX, including prohibitions on his ability to communicate with family members and infringements on his religious practices of his Muslim religion, see *Abdulmutallab v Sessions et al*, No. 17-02493 (D Colo). But the Court need not rely on Mr. Abdulmutallab's complaint. The US Department of Justice Office of the Inspector General Reports to Congress on Implementation of Section 1001 of the USA Patriot Act illustrates the discriminatory treatment Muslims face while incarcerated.[37]

Each year in prison takes two years off of an individual's life.[38] If living in general prison population is known to shorten life expectancy, life in solitary

---

[37] See March 19, 2018 Report at 5-9, available at https://oig.justice.gov/reports/2018/1803.pdf, documenting tens of civil rights and civil liberties complaints by Muslim inmates.

[38] *United States v Jenkins,* 854 F3d 181, fn 2 (2d Cir 2017) ("Although no one knows with any certainty how long Jenkins will live, we do know that, as a statistical matter, the life expectancy of an incarcerated person drops 2 years for each year of incarceration'"). See also Widra,E., Incarceration Shortens Life Expectancy, Prison Policy Initiative, (June 26, 2017) a*vailable at* https//:www.prisonpolicy.org/blog/2017/06/26/life expectancy.

confinement will have an exponential impact on Mr. Ftouhi's life expectancy. Life expectancy for an American male is seventy-six years.[39] Altogether, a sentence of twenty-five years or more could very well be a life sentence, given the conditions under which he will be living in solitary confinement.

Whenever anyone hears the term "terrorist", fear rises in hearts and minds. It is next to impossible not to react with anger. Mr. Ftouhi yelled the words "Allahu Akbar" at the airport, knowing that these words would spark a sense of fear and send a message. But, Mr. Ftouhi was the only one assigning meaning to his words and his behaviors. He is not and never was connected to a terrorist organization. He alone decided what his actions meant. Once you scratch below the surface, you will find a deeper, non-political meaning and motivation behind his behaviors. He is a mentally unstable, suicidal man, desperate to find a way out of his life.

An emotional reaction to Mr. Ftouhi's behavior may lead to a belief that retribution is the single most important message at sentencing, but retribution is not accomplished by excessive punishment. Retribution and punishment should take into account both Mr. Ftouhi's actions, his motivation, and his compromised state of mind, as a result of his depression, at the time of incident. Retribution in this case is achieved by having Mr. Ftouhi survive twenty-five years in solitary confinement,

---

[39] Murphy, SL, Xu, JQ, Kochanek, KD, Arias, E. Mortality in the United States, 2017. NCHS Data Brief, no 328. Hyattsville, MD: National Center for Health Statistics. 2018, at https://www.cdc.gov/nchs/products/databriefs/db328.htm.

only to be released as a man in his seventies, who will then be deported to either Canada or Tunisia, after losing everything and everyone in his life.

## F.  Protection of the Public

We are asking for Mr. Ftouhi to be incapacitated for twenty-five years in prison, which he will serve in solitary confinement. He would not be released from prison until he was in his seventies. He would not only be incapacitated physically, but he would also be incapacitated mentally, by continuing to be isolated from the public, his family, and likely even other inmates for most of his time in custody.

## G. Deterrence

An unnecessarily lengthy sentence is unlikely to promote general deterrence. Empirical research shows that, while certainty of punishment has a deterrent effect, "increases in severity of punishment do not yield significant (if any) marginal deterrent effects.[40]   The government is more likely to achieve general deterrence

---

[40] Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28-29 (2006). *See also* Sentencing Advisory Council, Does Imprisonment Deter? *A Review of the Evidence* at 14 (April 2011) ("'There is generally no significant association between perceptions of punishment levels and actual levels … implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms.'") (internal citation omitted); see id. at 15 ("the studies on changes to sentence severity do not imply that punishment does not generate any deterrent effect at all. Instead, the authors demonstrate that the deterrent effect does not increase or decrease according to the actual punishment level to any substantial degree."); Durlauf, S. & Nagin, D., *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y, 30, 31 (Jan. 2011) ("These studies suggest that increases in severity of punishment have at best only a modest deterrent effect."); Pasternoster,R., *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 817 (2010) ("[I]n virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity.")

through the widespread publication of Mr. Ftouhi's prosecution and conviction. Thus, all those considering a similar offense, but with the intelligence and wherewithal to resist such behavior, have already been deterred.

### H. Rehabilitation- To Address the Needs of the Defendant

In an ideal world, rehabilitation would include long-term mental health treatment and a de-radicalization program for Mr. Ftouhi. Mental health counseling would be the most meaningful way to help mitigate any future risk; however, Mr. Ftouhi is not likely be afforded any treatment in the BOP. Maximum security facilities, where Mr. Ftouhi will be housed, do not offer any type of mental health programming. In addition, the BOP does not currently have any de-radicalization programs. He will be simply be warehoused throughout his incarceration.

### I.  Avoiding Unwarranted Disparities with Other Similar Defendants

Although many people have been prosecuted by the US government under terrorism laws, few of these cases are factually similar Mr. Ftouhi's.  Almost all of the prosecutions involve material support charges under 18 USC 2339A and 2339B. See chart attached to Defendant's sentencing memorandum in *United States v Saleh*, No. 15-00393-MKB, R 137-1, beginning at Pg ID 2135 (EDNY, filed 1/23/18). The closest case the undersigned located was that of Fareed Mumuni, a co-defendant of Saleh, who repeatedly attempted to stab an FBI agent with a knife when agents came

to his home to execute a search warrant,[41] supported the Islamic State of Iraq and the Levant ("ISIL"), espoused violent jihadi beliefs, and planned an attack on law enforcement officers, see Complaint, R 1, *United States v Mumuni*, No. 15-mj-00554 (EDNY, filed 6/17/15).  Facing guidelines of life, the court imposed a 17-year  (204 months) sentence, as follows:

- Count One. Conspiracy to provide Material Support to a Foreign Terrorist Organization, 18 USC 2339B, 120 months concurrent with all other counts (statutory maximum 20 years);

- Count Two, Attempt to Provide Material Support to a Foreign Terrorist Organization, 18 USC 2339B, 120 months concurrent with all other counts (statutory maximum 20 years);

- Count Three, Conspiracy to Assault Federal Officers, 18 USC 371, 60 months concurrent with all other counts (statutory maximum 5 years);

- Count Five, Attempted Murder of Federal Officers, 18 USC 1113, 1114(3), 120 months concurrent with all other counts and 84 months consecutive to other counts (statutory maximum 20 years); and

- Count Six, Assault of a Federal Officer, 18 USC 111(b), 60 months concurrent with all other counts (statutory maximum 20 years). [42]

---

[41] The stabbing attempts were unsuccessful because the agent wore body armor.
[42] A term of ten years supervised release was also ordered.

Mr. Mumuni's total guidelines range was 85 years, the statutory maximum sentence on all counts; this was the sentence which the government requested (R 161, Pg ID 2507). But the court rejected this request, finding that a variance from the guidelines was appropriate given his personal characteristics.

Commentators have warned against unnecessarily lengthy sentences for terrorism offenses, see Ahmed, S., *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale LJ 1520, 1566 (2017). One reason is the possibility of further radicalization while in prison.[43] See also SpearIt, *Muslim Radicalization in Prison: Responding with Sound Penal Policy or the Sound of Alarm?* 49 Gonz. L. Rev. 37, 60-62 (2013).

## III.   Conclusion

There is no dispute that Amor Ftouhi is responsible for inflicting great physical and emotional pain on the victim in this case and those present during the incident. His behavior was a marked deviation from his otherwise docile and kind demeanor. Mr. Ftouhi was universally described by those who know him outside of this case as a quiet, polite man who would never engage in violence.

---

[43] Office of the Inspector Gen., US Department of Justice, *A Review of the Federal Bureau of Prisons' Selection of Muslim Religious Service Providers* 6 (2004), available at https://oig.justice.gov/special/0404/final.pdf.

Mr. Ftouhi was wholly unprepared for the challenges he would face both as a first-generation Canadian immigrant and as a Muslim in a predominately Christian city. He was ashamed to tell his family that he needed help and that he was struggling financially, and he was too proud to tell Najoua and his children about his perceived failures. Mr. Ftouhi is a desperate, traumatized, depressed person, not a psychologically normal ideological extremist. He was not an indiscriminate jihadi who set out to create mass casualties; rather, he was motivated by his own suffering to end his life by killing to be killed.

For these reasons, Amor Ftouhi seeks a sentence of twenty-five years imprisonment.

Respectfully Submitted,

s/Joan E. Morgan, s/ Bryan Sherer, and
s/Dana Mertz
Federal Community Defender, ED of Michigan
111 E. Court Street, Suite L-100
Flint, Michigan 48502
(810) 406-4133

## CERTIFICATE OF SERVICE

I certify that on April 11, 2019, I filed this document using the ECF system, which will send notification of the filing to counsel of record, and I hand delivered the document to Probation Officer Chad Woycehoski.

s/ Joan E. Morgan

44