UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 17-cr-20456 |
| Plaintiff, | Hon. Matthew F. Leitman U.S. District Judge |
| v. | Hon. Stephanie Dawkins Davis |
| AMOR M. FTOUHI, | U.S. Magistrate Judge |
| Defendant. | |

## THE UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM

On June 21, 2017, Amor Ftouhi stabbed Flint Bishop Airport Police Lieutenant Jeffrey Neville in the back of the neck and slashed his throat. Ftouhi wanted to kill Neville and take his gun to kill as many others as possible until he was killed. Ftouhi was on a mission to commit a jihadi attack against the United States. Fortunately, Ftouhi's mission did not succeed.

A jury convicted Ftouhi of committing an act of violence at an international airport (count one), interference with airport security (count two), and committing an act of terrorism transcending national boundaries (count three).

Ftouhi's sentencing guidelines call for life imprisonment, and a life sentence is necessary under the factors of the Sentencing Reform Act, 18 U.S.C. § 3553.

1

The United States asks the Court to impose a life sentence on counts two and three and a sentence of twenty years on count one.

## I.   Factual background

Amor Ftouhi tried to kill Lieutenant Jeff Neville on June 21, 2017. But the planning and preparation for his attack began much earlier.

Ftouhi was raised in Tunisia, where he obtained a bachelor's degree and was employed as a school teacher. He married his wife, Najoua Yahyaoui, in 1995 and had his first child a few years later. Ftouhi remained in Tunisia until 2007 when he emigrated to Canada. In Montreal, Ftouhi lived in a two bedroom apartment, received $1,500 per month from the government and was employed up until two weeks before his attack. Ftouhi worked a number of jobs in Canada, including as a security guard, truck driver, deli employee, and, as recently as two weeks prior to his attack, offloading boats. Ftouhi's wife described his mental health in June of 2017, as very happy, positive and hopeful. By contrast, Ftouhi stated he was depressed about his financial situation and wanted to kill and be a martyr in order to be an example for other would-be terrorists.

Ftouhi began planning for his attack no later than March 21, 2017, when he used his Google account to find the location of Novi, Michigan. This search

corresponded to notes of gun shows Ftouhi made at his home in Montreal,

including a gun show at the Novi Expo Center on April 14 and 15, 2017.



(Gov. Tr. Ex. 17 A, B, and C – gun show notes seized from Ftouhi's apartment.)

Ftouhi chose Michigan as the location for his attack because he believed it

would be the easiest place to buy a gun. And he chose the 27th day of the Muslim

holy month of Ramadan—what some refer to as the Night of Power—as the time

for his attack because he believed that it would increase the chances that his attack

would be successful and that he would be accepted into heaven as a martyr.

As Ramadan approached, Ftouhi's preparation increased. By the end of

May, he had saved tactical training videos to his tablet. These included an

instructional video on loading and reloading an assault rifle while under duress and

at top speed; a video on the proper way to aim and fire an assault rifle, with advice

on how to hold the gun, squeeze the trigger and "shoot and kill;" and, what appears to be a video on hand-to hand combat which showed how to disarm armed personnel.

Along with the firearm training videos, Ftouhi researched government surveillance techniques, so that law enforcement would not thwart his mission. He also did additional research on the locations of gun shows and gun stores in Michigan.



(Gov. Tr. Ex. 10 – gun show printout seized from Ftouhi's van.)

Prior to leaving for the United States to commit his attack, Ftouhi left what he described as his last will and testament. In it, Ftouhi asked his wife to tell his family that he "did not go out, save for God and for the victory of His religion and His rules, hoping that God grant me the eternal heaven and paradise." He explained to her that, although she had been a good wife and he loved her, his "love for God Almighty and the Jihad for His sake is greater." (Gov. Tr. Ex. 19b – translation of will and testament.) At its conclusion, Ftouhi wrongly predicted: "Mission accomplished."

On June 15, 2017, Ftouhi deposited an empty envelope into an ATM in order to withdraw $1,000 for the purchase of a gun from his overdrawn checking account. On June 16, Ftouhi entered the United States, and by June 18 he was in Michigan making his final preparations. He first drove to the Gibraltar Trade Center, approached several firearm vendors and bickered with a salesman who refused to sell him an AR-15 style assault rifle with a 30 round magazine, depicted below.



(Gov. Tr. Ex. 32 – photo of firearm from Gibraltar Trade Center.) Ftouhi bought a large combat knife instead.

Ftouhi left the Gibraltar Trade Center and drove to Walmart, where he again looked for guns, and then he drove to a store called Guns & Stuff. Still without a gun, Ftouhi went to McDonalds, where he logged onto the wifi and continued to prepare. He reviewed an article entitled: "Want to Buy a Gun Without a Background Check?" and visited a site advertising "Private gun Sale – No Questions Asked No Sale." He searched Google for gun shops, private gun sellers and how to buy a gun.

For a short time, however, Ftouhi's attention was diverted from how and where to buy a gun and focused on where he should use it. Almost exactly one year after the mass shooting at the Pulse Nightclub in Orlando and in the midst of his frantic search for gun stores, Ftouhi toggled his Google searches back and forth between guy club, gay club and airport. Ftouhi's Samsung Tablet show several searches for "guy bar," "aeroport," and "Aeroport Michigan" between 12:08 p.m. and 12:20 p.m. Records of Ftouhi's Google search history show that Ftouhi searched Google maps for "guy club" at 12:39:50 p.m., "gay club" at 12:40:32 p.m., "aeroport" at 12:42:00 p.m., and "aéroport michigan usa" at 12:42:57 p.m. [1] Based on the timing of these searches, it appears that Ftouhi was considering possible targets for his attack.

Ftouhi left the McDonalds, visited more firearm stores without success and wired his unspent money back to his wife.

During the morning of June 19, Ftouhi was in Genesee County. Again using a McDonald's wireless connection, Ftouhi searched for directions to Baker College

---

[1] At trial the government did not present evidence of the searches for guy club and gay club because of the possibility of prejudice to Ftouhi, particularly in light of the mass shooting at the Borderline Bar and Grill in Thousand Oaks, California, which resulted in 13 deaths, that occurred during trial.

and then Bishop Airport. Based on the timing of the searches, Baker College may have also been a potential target.

On June 20, Ftouhi conducted surveillance at Bishop airport. For over two hours, Ftouhi walked around the airport, observed security and looked for locations to conduct his attack. Having failed to buy a gun, Ftouhi decided to use his combat knife to kill and disarm a police officer, take the firearm and continue his attack.



(Screen shot of Bishop Airport video surveillance on June 20, 2017.)

A day later, on June 21, Ftouhi entered the Bishop Airport just before 9:00 a.m. He went to a café on the second floor of the airport where he watched airport

police officers and waited for his opportunity to kill. About a half-hour later, as
Lieutenant Jeff Neville prepared to move a parked squad car, Ftouhi attacked. He
stabbed Lieutenant Neville from behind, hitting his vest, and then slashed his
throat nearly from his windpipe to his spine. He cut through flesh and muscle,
coming within millimeters of killing Neville. As he raised his knife to strike
Neville again, Bishop Airport maintenance employee Richard Krul intervened.
Krul stopped Ftouhi's blade mid-swing and wrestled him to the ground. Ftouhi
continued to fight until Bishop Police Chief Chris Miller and Firefighter Lieutenant
Dan Owen handcuffed him.

Ftouhi was arrested and taken to a holding cell at the airport. Flint Police
Captain Leigh Golden, who was at the airport for a meeting, monitored Ftouhi in
the holding cell. From within his cell, Ftouhi lunged toward Golden, and told her to
"Give it [her gun] to me to kill you." Ftouhi then spat on her.



 (Gov. Tr. Ex. 36A.)

Ftouhi was interviewed twice by the FBI. During the first interview, Ftouhi
reported that he came to the airport alone and was not working with any others. He
told the agents that he was on a mission to kill government officials. When the

9

agents told Ftouhi they did not know if Neville had been killed in the attack, Ftouhi responded, "I hope so."

During the second interview, Ftouhi described the purpose of his attack. He came to punish America for its support of Israel and for its foreign policy in the Middle East. He claimed he was a soldier of Allah, his mission was to kill police and he would not be done until he was killed. At one point, Ftouhi eyed an agent's weapon and told the agent he would kill him with it if he had the opportunity. And while he hoped to murder employees of the government, Ftouhi believed he would be forgiven for killing civilians as well. Ftouhi told the agents that he chose Michigan because he believed it would be an easy place to buy a gun and the airport so that his attack would gain worldwide attention. Ftouhi admitted that he planned to kill a police officer, take his gun and continue killing. Agents asked Ftouhi if he wanted to hurt or kill the officer. Ftouhi responded "kill." Ftouhi asked the agents whether or not the officer had died. When the agents answered that they did not know, Ftouhi leaned forward, cried and said "I hope he dies."

Ftouhi was brought to federal court and detained pending trial. A grand jury returned a superseding indictment charging Ftouhi with three counts: violence at an international airport (count one), interference with airport security (count two); and

10

terrorism transcending national boundaries (count three). (R. 31, First Superseding Indictment, PgID 146-53.)

After his arrest and detention, Ftouhi remained remorseless about his attack. Ftouhi wrote his wife again from his detention center and told her: "Tell my children that I love them all; they must be proud of their father, who is fighting the infidel criminals. I am not like the other Muslims, who are all talk and no action, who have held on to earthly matters, and stayed away from jihad; thus they are shamed and humiliated." (Gov.Tr. Ex. 38B – translation of the letter from Ftouhi on white paper.)

Prior to trial, Ftouhi's defense attorneys filed a notice of insanity or diminished capacity defense (R. 53, Notice of Defendant's Mental Condition, PgID 227-28) and had Ftouhi psychologically evaluated. After the evaluation, defense counsel withdrew the notice. (R. 56, PgID 233-34.) Ftouhi went to trial and the jury convicted him of all counts on November 13, 2018. (R. 100, Verdict Form, PgID 1532-1534.) The jury rejected the defense claim that Ftouhi was merely trying to commit "suicide by cop." The evidence at trial showed that Ftouhi attempted to purchase an assault rifle, chose an airport for the location of his attack and took measures to avoid contact with authorities prior to his attack. And rather

than run toward Lieutenant Neville head- on with a raised knife, Ftouhi came at

Lieutenant Neville from behind and stabbed and slit his throat while in back of

him. Defendant raises the same "suicide by cop" claim here, and the Court should

likewise reject it.

## II.    Sentencing Guidelines

After Ftouhi's conviction, the probation department prepared a presentence

investigation report (PSR) which calculated Ftouhi's sentencing guideline to be life

imprisonment. The probation department determined that the terrorism

enhancement under U.S.S.G. § 3A1.4 applied (PSR ¶ 28), and it calculated

Ftouhi's adjusted offense level as 55 (PSR ¶ 32) and his criminal history category

as VI (PSR ¶ 39). Ftouhi's adjusted offense level of 55 was twelve points higher

than the highest offense level on the sentencing guideline table, level 43. Because

of this, the probation department capped Ftouhi's total offense level at 43. Neither

party has objected to the sentencing guideline calculation in the PSR.

A. Calculation of the base offense level and special offense characteristic

In calculating the offense level, the probation department grouped Ftouhi's

convictions on counts one, two and three pursuant to U.S.S.G. § 3D1.2(b), because

the three offenses involve substantially the same harm. (PSR ¶ 25.) Under U.S.S.G.

§ 2A2.1(a)(1), Ftouhi's base offense level is 33, because he committed an assault with the objective of committing first degree murder. (PSR ¶ 26.) Application note 1 of U.S.S.G. § 2A2.1 defines first degree murder as "conduct that if committed within the … territorial jurisdiction of the United States, would constitute first degree murder under 18 U.S.C. § 1111." U.S. SENTENCING GUIDELINES MANUAL § 2A2.1 cmt. n.1 (2018). 18 U.S.C. § 1111(a), states that first degree murder includes "every murder perpetrated . . . by lying in wait, or any other kind of willful, deliberate, malicious and premeditated killing. . . . or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed. . . ." 18 U.S.C. § 1111(a).

In Ftouhi's case, the application of § 2A2.1(a)(1) is supported by the overwhelming evidence at trial of Ftouhi's planning and premeditation including Ftouhi's attempted purchase of firearms, his purchase of the combat knife, the fact that he went to the airport the day before the attack to observe security there, and the fact that on the morning of the attack he coldly watched airport police officers for 27 minutes before stabbing Lieutenant Neville. It is further supported by the

fact that Ftouhi intended to kill Neville as part of a "premeditated design" to take Neville's firearm and continue to kill others.[2]

The probation department included a four-level enhancement under U.S.S.G. § 2A2.1(b)(1)(A) based on the fact that Lieutenant Neville sustained life-threatening bodily injuries. Application note 1 of U.S.S.G. § 2B1.1 defines "permanent or life-threatening bodily injury" as "injury involving a substantial risk of death. . . ." U.S. SENTENCING GUIDELINES MANUAL § 1B1.1 cmt. n.1 (2018). At trial Dr. Donald Scholten, Lieutenant Neville's trauma surgeon, testified about Lieutenant Neville's injury. Dr. Scholten explained that Neville needed life-saving emergency surgery. Scholten described the laceration across Lieutenant Neville's neck as being about a millimeter away from severing his windpipe, jugular vein, and carotid artery, being deep enough to see the top of his collar bone and jaw, and described seeing the outer wall of Neville's carotid artery pulsating. Scholten said

---

[2] In finding Ftouhi guilty of terrorism transcending national boundaries (count three), the jury concluded that Ftouhi attempted to commit a first degree murder under Michigan law. (R. 83, Joint Proposed Jury Instructions, PgID 1386-87.) Like 18 U.S.C. § 1111, Michigan's first degree murder statute, MCL § 750.316, includes premeditated killings, but also includes intentional and knowing murder of police officers who are engaged in their duties. There was overwhelming evidence at trial that Ftouhi's attack against Lieutenant Neville was an attempted premeditated murder as well as an attempted murder of a police officer.

that the reason that Neville did not die was simply luck. Scholten's uncontradicted testimony establishes that the gash Ftouhi made across Lieutenant Neville's neck involved a "substantial risk of death."

### B. Official victim enhancement

The probation department also included a six-level enhancement under U.S.S.G. § 3A1.2(c)(1), because Ftouhi assaulted Lieutenant Neville, a law enforcement officer, in a manner which created a serious risk of bodily injury. Application note 4 of U.S.S.G. § 3A1.2 states that the enhancement applies when there is "an aggravated assault against a law enforcement officer . . . that is sufficiently serious to create at least a 'substantial risk of serious bodily injury'." U.S. Sentencing Guidelines Manual § 3B1.2 cmt. n.4 (2018). During Ftouhi's interview, he said that he targeted his victim as part of his mission to kill armed U.S. government employees. Ftouhi explained that he planned to take Lieutenant Neville's gun and use it to continue to kill other police officers until he was killed. Ftouhi also said that he wanted to kill a U.S. government employee at an international airport, because the location that would allow Ftouhi to receive world-wide attention. And Ftouhi told Captain Leigh Golden and the FBI agents who were interviewing him that he wanted to take their guns and use them to kill

15

them. Ftouhi's actions and his post-arrest statements clearly reveal his intent to kill law enforcement and that he attacked Lieutenant Neville because he was a police officer.

C. Terrorism enhancement

Ftouhi's base offense level (33 points), special offense characteristic (+4 points) and the official victim enhancement (+6 points), result in an offense level of 43 and a criminal history category of I, which renders a sentencing guideline of life imprisonment. Additionally, the probation department applied the terrorism enhancement set forth in U.S.S.G. § 3A1.4, but even without the terrorism enhancement, Ftouhi faces a guideline range of life in prison. Defense counsel claims that without the terrorism enhancement, Ftouhi faces a guideline sentence in the range of 17 to 21 years. (R. 103, Def. Sent Memo, PgID 1567.) This is not accurate. It is only by mischaracterizing the "official victim" enhancement in § 3A1.2(c)(1) as a second terrorism enhancement and discounting both the official victim enhancement and the terrorism enhancement that the defense arrives at a less than life guideline sentence.

The terrorism enhancement in section 3A1.4 provides that "if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," the

16

defendant's offense level is increased by twelve (with a minimum level of 32) and his criminal history category is elevated to category VI. A "federal crime of terrorism" is defined by cross-reference to 18 U.S.C. § 2332b(g)(5) and means "an offense that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct;" and (B) is a violation of an enumerated statute.

Ftouhi's convictions for committing an act of violence at an international airport, 18 U.S.C. § 37, and committing an act of terrorism transcending national boundaries, 18 U.S.C. § 2332b, are both enumerated under 18 U.S.C. § 2332b(g)(5). Additionally, Ftouhi's conviction for interference with airport security "involved or intended to promote" an enumerated offense. Based on a number of statements Ftouhi made, it is clear that his conduct was calculated to retaliate against actions of the United States government. According to trial testimony, at the time of the attack, Chief Christopher Miller and Lieutenant Daniel Owen heard Ftouhi yelling "Allahu Akbar," the mujahedeen's battle cry. After his arrest Ftouhi told the FBI agents that he yelled this because he knew it would create fear in those around him. Lieutenant Owen also heard Ftouhi yell, "kill all the infidels for what they did in Syria, Iraq, and Afghanistan." And

Ftouhi's statement to Flint Police Captain Leigh Golden, after lunging at her,

revealed that he wanted to retaliate against the United States:

| | | |
|---|---|---|
| Ftouhi: | You happy? Happy? You kill children? In Iraq? In Syria? You're a killer. | |
| Golden: | I've never killed anyone. | |
| Ftouhi: | Yeah. Yes you. And your nation. You're a bastard nation. Kill children, kill wife. Fuck you. Kill. You are killer generation. | |

(Gov. Tr. Ex. 36A.)

In his post-arrest interview, Ftouhi claimed that he was a "soldier of Allah,"

that he considered the United States an enemy and his mission was to kill as many

American law enforcement as possible before he, himself, was killed. Ftouhi said

that he has and always will have a strong hatred for the U.S. government. He

explained that he was angry about U.S. support for Israel and U.S. actions in

conflict areas in the Middle East. In his post arrest letter, Ftouhi told his children

that they should be proud of him because he was "fighting the infidel criminals."

(Gov. Tr. Ex. 38B – translation of letter from Ftouhi on white paper.) All of this

evidence clearly shows that Ftouhi's terrorist attack was an act of vengeance and in

retaliation for U.S. government conduct. The probation department correctly

applied the terrorism enhancement in the calculation of Ftouhi's sentencing

guideline.

### III.   Sentencing Factors under 18 U.S.C. § 3553(a)

In determining Ftouhi's sentence, the Court should consider the sentencing factors in 18 U.S.C. § 3553(a) and should impose a sentence which is "sufficient but not greater than necessary" to achieve the sentencing purposes of retribution, deterrence, incapacitation, and rehabilitation. *Tapia v. United States*, 131 S.Ct. 2382, 2387 (2011); 18 U.S.C. § 3553(a)(2). The Supreme Court has noted that the sentencing guidelines are the "starting point" and "initial benchmark" for any sentence imposed pursuant to 18 U.S.C. § 3553. *See Gall v. United States*, 552 U.S. 38, 49 (2007). Ftouhi's guidelines are life and there is no reason to vary from those guidelines. Indeed, in this case, a life sentence is the only sentence that will achieve the purposes of sentencing and is the appropriate sentence in light of the sentencing factors.

### A.   Nature and circumstances of the offense and history and characteristics of the defendant

Ftouhi's offense was unprovoked, cold, premeditated and brutal. Ftouhi did everything he could to kill Neville and slaughter others, and it was mere luck that Lieutenant Neville did not die. After his arrest, Ftouhi told officers that he wanted to take their guns and kill them until he was killed, so he could complete his mission. And in the letter to his wife, Ftouhi wrote that his children should be

19

proud of him for his attack. Ftouhi's offense and characteristics show he is an unrepentant terrorist who tried desperately to commit a mass murder.

And there is nothing in Ftouhi's history or characteristics that could possibly mitigate his sinister attack. Ftouhi claimed to FBI agents that if he had a stable job or family life, he would not have committed his attack. Even if that somehow mitigated his offense, it is contradicted by the evidence. Ftouhi was employed as he planned his attack. He continued working until June 7, 2017, and he began looking up gun shows in Michigan at least three months prior to the attack. On March 21, 2017, he Googled Novi, Michigan, the location of a gun show in Michigan.

Ftouhi was 49-years-old when he committed his attack. Based on the U.S. and Canadian investigations, including the statements of Ftouhi's family members, Ftouhi was educated, intelligent, and lived a good life in Canada with his three children and his wife of over twenty years. Ftouhi, however, was so consumed by hate that he left all of that aside to pursue his mission of murder.

B. <u>The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense</u>

Ftouhi's offense is among the most serious of all offenses. Ftouhi tried to murder a police officer in cold blood, and he did so in order to terrorize the United States. If not for luck and the courageous actions of Bishop airport employees, Ftouhi would have murdered countless innocent people. A life sentence is necessary to provide just punishment.

Ftouhi's counsel argues that the Court should consider the possible conditions of Ftouhi's confinement in determining its sentence, and goes on at length to describe the Administrative Maximum Facility ("ADX") in Florence, Colorado, stating that defendants, like Ftouhi, who are convicted of terrorism-related offenses are placed in that facility. (R. 108, Def. Sent. Memo, PgID 1582-86.) This is not accurate. Designation to ADX is not automatic for defendants convicted of terrorism offenses. Further, conditions of confinement are not one of the 3553(a) sentencing factors and should not be considered in fashioning the defendant's sentence.

21

C. <u>The need for the sentence</u> to afford adequate deterrence to criminal conduct and the need to protect the public from further crimes of the defendant

A life sentence is also necessary to reflect the fact that in this terrorism case, like others, there is a significantly increased need for general deterrence, an unlikely prospect for rehabilitation, and a crucial need to protect the public. Given Ftouhi's age, there is no basis to claim "immaturity at the time of the offense as a mitigating factor," *Gall v. United States*, 552 U.S. 38, 58 (2007), or that time will foster reflection and maturation and, ultimately, produce a man who would choose and act differently in the future. Given Ftouhi's firm commitment to complete his mission and kill law enforcement, the Court can have no confidence in his rehabilitative potential.

While courts have noted that recidivism ordinarily decreases with age, courts have rejected this reasoning in terrorism cases. As the Eleventh Circuit Court of Appeals explained in *United States v. Jayyousi*:

> . . . although recidivism ordinarily decreases with age, we . . . reject this reasoning here. Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.

657 F.3d 1085, 1117 (11th Cir. 2011) (quotations and citations omitted). This is

particularly true in this case. Ftouhi's hatred for the United States is longstanding—he celebrated the September 11 attacks when he was in Tunisia and has subscribed to the views of Al Qaeda since. He has not turned away or shown any remorse for his depraved actions. He could have pleaded guilty, but chose against accepting the consequences of his attack. In his letter to his wife, he could have apologized for choosing jihad over his family, but instead insisted that his children should be proud of his attack. In his letter to his daughter after trial, he offered no apology for his attack and its consequences—including the consequences to his own family. (R. 108-8, Def. Sent. Memo Ex. 7, PgID 1609).

Ftouhi's sentencing memo argues for a downward departure or variance from his criminal history category of VI, which is the result of the terrorism enhancement. (R. 108, Def. Sent. Memo, PgID 1568-71.) The cases cited by the defense, however, involved defendants who had been convicted of non-violent offenses. Ftouhi's offense is readily distinguishable in that it involved tremendous planning and brutal violence. In this case, a downward departure or variance is entirely inappropriate.

Lastly, the defendant's sentencing memo makes clear that Ftouhi will not denounce his attack. (R. 108, Def. Sent. Memo, PgID 1580-81.) Because of this,

there is a very high likelihood that Ftouhi, if released, would try to kill again. If Ftouhi were ever released, there would be no way to adequately supervise him in the future. In her interview with Canadian authorities, Ftouhi's wife adamantly claimed that she had never suspected that Ftouhi would try to kill a police officer or commit a terrorist attack. After a lengthy and rigorous investigation, there was no evidence that Ftouhi ever discussed his mission with others. Indeed, he told law enforcement that he avoided discussing his mission so that others would not alert the authorities. If Ftouhi's friends and family never would have suspected him of wanting to carry out a jihadi mission, there is no way that anybody in the future could adequately monitor Ftouhi to protect the public. Only a life sentence will adequately provide general deterrence, reflect Ftouhi's lack of rehabilitative potential, reflect Ftouhi's likelihood of recidivism, and protect the public from the increased danger of future harm that Ftouhi poses.

    D. <u>The need for the sentence</u> to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

Given the circumstances of this case, none of these factors are applicable. Ftouhi is well educated, speaks several languages, has worked in a variety of jobs, and is in good physical health. Ftouhi has claimed to the probation officer that he is

depressed, but that he refuses treatment. If Ftouhi is depressed and later seeks

treatment, he will be able to receive it in a custodial setting.

     E.  <u>The kinds of sentences available, the sentencing guidelines and
Sentencing Commission policy statements</u>

The statutory maximum sentence for count one is 20 years, and is life on

counts two and three. These penalties reflect the seriousness of Ftouhi's offenses.

As noted above, Ftouhi's sentencing guideline is life, and his adjusted offense level

is 55, which is 12 levels above the highest level in the sentencing guideline chart.

Ftouhi is subject to the sentencing guidelines' terrorism enhancement, which

reflects Congress' and the Sentencing Commission's assessment of the heightened

concerns presented by those who commit terrorist acts.

> The import of this enhancement 'could not be clearer:' It
> reflects Congress' and the Commission's policy judgment
> 'that an act of terrorism represents a particularly grave threat
> because of the dangerousness of the crime and the difficulty of
> deterring and rehabilitating the criminal, and thus that terrorist
> and their supporters should be incapacitated for a longer
> period of time.'

*United States v. Stewart*, 590 F.3d 93, 172-3 (2nd Cir. 2009) (J. Walker,

concurring) (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2nd Cir. 2003).

Applying the terrorism enhancement causes the defendant's criminal history

category to increase to the highest possible level, regardless of the defendant's

prior record, to reflect the need for deterrence. *Id.* at 172. The sentencing

guidelines call for a life sentence, and a life sentence would appropriately reflect

the sound policy judgments of Congress and the Sentencing Commission.

    F.  <u>The need to avoid unwarranted sentencing disparities</u>

      There are very few cases similar to this. In several instances, would-be

attackers have been shot to death by police during their attack.[3] In comparable

terrorism cases where defendants were prosecuted, defendants have been sentenced

to life in prison. *See* Amended Judgment, *United States v. Mamdouh Mahmud*

*Salim*, 1:01-cr-00002 (S.D.N.Y. Sept. 9, 2010), Doc. 126 (defendant sentenced to

life imprison for attempted murder and conspiracy to murder a federal corrections

---

[3] On September 17, 2016, Dahir Adan stabbed patrons at a Minnesota shopping mall while shouting "Allahu Akbar" and was shot dead after charging a police officer. https://www.reuters.com/article/us-minnesota-mall-stabbings-idUSKCN11O04S. On February 11, 2016, Mohamed Barry attacked restaurant patrons with a machete and was killed as he attempted to attack police officers while yelling, "Allahu Akbar." *"Nazareth Restaurant Reopens After Machete Attack." WBNS-TV. https://www.10tv.com/article/nazareth-restaurant-reopens-after-machete-attack.* On November 4, 2015, Faisal Mohammad stabbed four people with a hunting knife at the University of California, Merced, in an apparent ISIS-inspired attack, before being shot to death by police. https://thehill.com/blogs/blog-briefing-room/news/273524-fbi-student-in-uc-merced-campus-stabbing-inspired-by-terrorist. On June 2, 2015, Usaamah Abdullah Rahim was shot and killed by law enforcement after charging them with a knife. Complaint, *United States v. David Wright and Nicholas Rovinski*, 1:15-cr-10153, (D.Ma. June 12, 2015), Doc. 1-2.

officer where defendant stabbed a corrections officer in the eye with a sharpened comb); *United States v. Mamdouh Mahmud Salim*, 549 F.3d 67 (2nd Cir. 2008) (finding terrorism enhancement applied). *See also, United States v. Siddiqui*, 699 F.3d 690 (2nd Cir. 2012) (defendant sentenced to 86 years for attempted murder of U.S. officers in Afghanistan and other offenses where defendant gained control of a rifle while being questioned and fired at the officers, thereafter screaming that she was going to "kill all you Americans"); *Commonwealth of Pennsylvania v. Edward Archer*, Docket No. MC-51-CR-0000777-2016, Oct. 1, 2018, and https://www.nbcphiladelphia.com/news/local/Edward-Archer-Sentence-Philadelphia-Police-Officer-Jesse-Hartnett-Sentence-482531741.html (defendant sentenced to up to 97 years in prison for ISIS-inspired attempted murder of a Philadelphia police officer); http://www.njecpo.org/?p=4183 and https://abc7ny.com/isis-sympathizer-gets-life-for-murder-of-nj-college-student/3411700/, (defendant sentenced to life in prison in New Jersey for killing a student that he said was in retaliation for killings of Muslims in Syria, Iraq, and Afghanistan).

A life sentence has also been imposed in comparable terrorism cases where the defendant plotted an attack intending multiple deaths, but the plan did not

27

progress as far as Ftouhi's attack. *See, e.g.,* Judgment*, United States v. Justin Nojan Sullivan*, 1:16-cr-00005 (W.D.N.C. June 30, 2017), Doc. 69, and https://www.justice.gov/opa/pr/north-carolina-man-sentenced-life-prison-attempting-commit-act-terrorism-transcending (defendant sentenced to life in prison for attempting an act of terrorism transcending national boundaries in support of ISIS where he discussed plans with an FBI undercover employee to engage in a mass shooting, told the undercover employee that he planned on buying an AR-15 at a gun show, and attempted to purchase ammunition to be used in the weapon); Judgment, *United States v. Eljvir Duka*, 07-cr-00459 (D.N.J. April 29, 20090, Doc. 421 and https://www.justice.gov/opa/pr/three-brothers-sentenced-life-prison-terms-conspiring-kill-us-soldiers (defendant sentenced to life in prison for planning an armed attack on U.S. soldiers at Fort Dix); Judgment, *United States v. Shain Duka*, 07-cr-00459 (D.N.J. April 28, 2009), Doc. 419 (same); Judgment, *United States v. Dritan Duka,* 07-cr-00459 (D.N.J. April 28, 2009), Doc. 417 (same); Judgment, *United States v. Mohamed Ibrahim Shnewer*, 07-cr-00459 (D.N.J. April 29, 2009), Doc. 425 (same); Judgment, *United States v. Harlem Suarez*, 15-cr-10009 (S.D.Fl. April 20, 2017), Doc. 171 and https://www.justice.gov/opa/pr /florida-resident-sentenced-life-prison-attempting-

possess-weapon-mass-destruction-and-provi-1, (defendant who planned to plant bomb on a Florida beach sentenced to life in prison).

In this case, Ftouhi plotted an attack involving multiple deaths, and continued with his mission even after slashing Lieutenant Neville's throat and nearly killing him. A life sentence would be in line with the above-cited cases and the guidelines, and would avoid unwarranted sentencing disparities.

## IV.    Conclusion

The defense has characterized Ftouhi's attack as a one-time event; a product of his depression and hopelessness. But that misses the mark. Ftouhi may have been unsatisfied with his life but he tried to kill Jeff Neville and intended to kill countless more because he dreamed of being a mujahedeen—a warrior. He yearned to be revered and killing was the way to achieve that. Life imprisonment

is the only just sentence for this crime and the only way to ensure the public's

safety in the future. The Court should impose that sentence.

Respectfully submitted,

April 11, 2019                                 MATTHEW SCHNEIDER
                                              United States Attorney


s/ *Jules M. DePorre*                          s/*Cathleen M. Corken*
Assistant United States Attorney               Assistant United States Attorney
600 Church Street                              211 W. Fort Street, Suite 2001
Flint, Michigan 48502                          Detroit, MI 48226
Phone: (810) 766-5026                          Phone: (313) 226-9100
Fax: (810) 766-5427                            Fax: (313) 226-2311
jules.deporre@usdoj.gov                        Cathleen.corken@usdoj.gov
P-73999


s/ *Craig Wininger*
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9100
Fax: (313) 226-2311
Craig.wininger@usdoj.gov

30

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 11, 2019, I filed or caused to be filed the foregoing document on the ECF system, which will send notice to counsel of record.

*s/Jules M. DePorre*
Assistant United States Attorney